# Illinois Official Reports

## Appellate Court

---

### *People v. James*, 2017 IL App (1st) 143036

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SAMUEL JAMES, Defendant-Appellant. |
| District & No. | First District, First Division<br>Docket No. 1-14-3036 |
| Filed<br>Rehearing denied | May 22, 2017<br>June 20, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-CR-922; the Hon. Maura Slattery Boyle, Judge, presiding. |
| Judgment | Affirmed in part, vacated in part; mittimus corrected. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Bradley Jarka, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Eric Leafblad, Miles J. Keleher, and Jesse B. Guth, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE MIKVA delivered the judgment of the court, with opinion. Presiding Justice Connors and Justice Simon concurred in the judgment and opinion. |

**OPINION**

¶ 1 Defendant Samuel James was charged with various drug- and firearm-related offenses resulting from events occurring on November 28, 2012. Following a jury trial, Mr. James was found guilty of the unlawful and knowing possession of benzylpiperazine (BZP), a controlled substance (720 ILCS 570/402 (West 2012)); aggravated unlawful use of a weapon (AUUW), for carrying a firearm without a valid Firearm Owner's Identification (FOID) card (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2012)); and armed violence, based on his possession of the BZP while armed with a firearm (720 ILCS 5/33A-2(a) (West 2012)). Mr. James was sentenced, on the charge of armed violence, to 15 years of imprisonment, followed by 3 years of mandatory supervised release.

¶ 2 On appeal, Mr. James argues that (1) the trial court abused its discretion by failing to inquire during *voir dire* regarding potential jurors' feelings about guns, (2) statements made by the prosecutor during closing and rebuttal arguments denied Mr. James a fair trial, (3) under the one-act, one-crime rule, Mr. James's convictions for possession of a controlled substance and AUUW should be vacated, and (4) the trial court erroneously failed to order 303 days of presentence credit for sanitation work that Mr. James completed while he was incarcerated.

¶ 3 For the reasons that follow, we affirm Mr. James's conviction for armed violence, vacate his convictions for possession of a controlled substance and AUUW, and correct the mittimus to reflect both this change and, consistent with the trial court's oral pronouncements at sentencing, an award of 303 days of presentence credit, if eligible, for sanitation work performed by Mr. James while he was incarcerated.

¶ 4 BACKGROUND

¶ 5 On July 15, 2014, the trial court conducted *voir dire* of potential jurors. Before beginning, the court discussed with counsel its typical process. During that discussion, the following exchange occurred between defense counsel and the court:

"MR. BEDI [defense counsel]: Do you ask about any strong feelings about guns one way or the other?

THE COURT: I am always afraid of that. Usually it involves—I ask, have you ever been a victim of a crime. What I do, if I get the sense if somebody has been, family member or victim [*sic*], I streamline the question and I take the person in back so there is no other way to contaminate the rest of the jury. I don't want any statements or ideas to come out that might affect the rest of the jury. If we have any individuals that we see that they have a feeling towards guns I put it on the side. I try to minimize the ripple effect."

¶ 6 After the venire was seated, the trial court read the charges against Mr. James, including the charge of armed violence for possessing a controlled substance while armed with a firearm and the charge of AUUW in that he knowingly carried a firearm while not on his own land and without having been issued a FOID card. The court admonished the venire as a group that, among other things, they must follow the law as instructed, they must not arrive at any conclusions until all of the evidence was heard, independent investigation and the consideration of outside information were not permitted, and the court would ask them questions to ensure a fair and impartial trial.

¶ 7	The trial court then questioned the venire pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). The court began by asking each prospective juror individually the same series of preliminary questions: whether they or any of their family members or close friends had been victims of crimes, and, if so, whether they could nevertheless remain impartial; whether they knew any attorneys, judges, or police officers, and if so, whether they could remain fair and impartial regardless of these relationships; whether they would give each witness's testimony the same weight and level of credibility regardless of the witness's profession; and, finally, whether they could consider all of the evidence and apply the law as instructed by the judge in a fair and impartial manner.

¶ 8	These questions elicited responses relating to past experiences with firearms from several jurors. Edgar Ovalle, for example, stated that he and his mother owned a store and she was held up at gunpoint twice, approximately 18 years ago. However, Mr. Ovalle said that there was nothing about those events that would prevent him from being fair and impartial as a juror in this case. Hector Bacajol also stated that three years ago he was "robbed at gunpoint by the gangbangers in [his] neighborhood" and ten years ago his fiancée "was involved in a drive-by shooting in the neighborhood." Like Mr. Ovalle, Mr. Bacajol denied that there was anything about these experiences that would prevent him from being fair or impartial. Mr. James subsequently used two of his peremptory strikes to eliminate Mr. Ovalle and Mr. Bacajol.

¶ 9	Another potential juror, Dr. Alan Samarel, indicated that his father-in-law was robbed and shot in Manhattan approximately 15 years ago but said that there was "[p]robably not" anything about that event that would prevent him from being a fair and impartial juror. Dr. Samarel likewise told the court that there was "[p]robably not" anything about the fact that his "closest friend in Chicago" was a criminal defense lawyer who had talked to Dr. Samarel multiple times about his cases that would affect his impartiality. However, Dr. Samarel indicated that "[t]he issue of gun violence" was an aspect of his relationship with his uncle, who had been a police detective in the Bronx, that could affect his ability to remain impartial:

> "Q. [The court:] Is there anything about your acquaintance with your uncle that would prevent you from being fair and impartial here today?
>
> A. The issue of gun violence.
>
> Q. But I am saying, the fact of him and his work, can you look at the facts of this case, apply the law that I instruct you on, assess these witnesses, and be fair and impartial?
>
> A. I think so."

¶ 10	The court then conducted an *in camera* examination of Dr. Samarel in order to follow up on the nature of his views on gun violence:

> "Q. Hi. Have a seat. So I want to inquire as regards to your ability. You are prejudiced?
>
> A. Well, it has to do with the way you phrased the question. You have two people, trained observer, untrained observer sees something. I would believe the trained observer. So I consider the police trained observers. Policeman sees somebody—
>
> Q. You would give a layperson less credibility? You are giving one person more credibility by the nature of their job—
>
> A. Right.
>
> Q. —as opposed to assessing them on the stand? That's prejudicial.

A. Right, because of the nature of their training and experience.

Q. Or is that not wanting to serve?

A. No.

Q. You indicated an opinion about gun violence.

A. Well, I do have an opinion about gun violence, right.

Q. Yes?

A. So.

Q. Are you of the presumption that most of the world accepts gun violence?

A. Accepts it or?

Q. Encourages it? Likes it?

A. No. I think it—

Q. Okay. So I don't understand. What would that view of not liking gun violence have to do with—there is no allegation of violence here other than possession of controlled substance or possession of a gun. There is no indication of agg [*sic*] discharge or any type of aggravated discharge with a fire weapon. I am a little confused. I don't like gun violence, I don't like to see it. So what difference would that make it?

A. Well, the person is accused of possessing a firearm illegally though, right? This is kind of like a black-and-white situation, unless there is an illegal search or something like that.

Q. It's really not a black-and-white situation. It is looking at the facts, taking your common sense and looking at something and wanting to do your civic duty and obligation and serve and assess the case and the facts and the law that applies in this case.

A. Yeah, but it doesn't change my opinion the fact that, being a gun owner myself and knowing what goes into background checks and the whole thing.

Q. So you are not prejudiced against guns, you are just prejudiced against gun violence.

A. Illegal gun owners. I am prejudiced against, yeah, sure.

Q. The contrariness of this is amazing to me.

A. Well, so I am a very contrary person I guess.

Q. I think it is more so with not wanting to do with [*sic*] jury service.

A. No.

Q. I think it does. I think you are indicating you are prejudiced or [*sic*] prejudiced person?

A. I am being truthful with you.

Q. We all experience things in the city of Chicago, county of Cook, or North Shore, whatever, but the ability to put things aside and assess. As an educated individual who received an M.D., you should be able to look at the factual situation, apply the law as instruct it [*sic*] to you, and do your civic duty in regards to jury duty.

A. All that being true, it doesn't change my feeling about how I answered that question.

Q. I understand. It is the lack of wanting to serve.

A. No, no, that's not it at all.

Q. I'm sorry. The record reflects."

Based on this exchange, the court excused Dr. Samarel and dismissed him for cause.

¶ 11 The jury was empanelled and the two-day trial began the same day.

¶ 12 In its preliminary instructions, the trial court warned the jurors that, throughout the trial, they would hear various evidentiary objections, explaining:

> "When I sustain an objection you will hear me say 'objection sustained' and you will disregard the question and answer, if one is given. You must not infer anything from the question or answer and you must not speculate on what the witness would have said if I would have allowed him or her to answer.

> Regarding evidence or comments that I strike from the record I will say, 'The jury will disregard that answer. It is stricken from the record.' It must be completely disregarded by you and erased from your mind just as if it was never spoken at all."

¶ 13 Chicago police officer Salvador Lara then testified that, on the evening of November 28, 2012, he was on plain clothes patrol in an unmarked squad car with his partner. In response to a call that a robbery had taken place, the officers drove to the 6000 block of South Vernon Avenue. Officer Lara testified that, when they arrived, he saw Mr. James walking on the sidewalk from a distance of between 15 and 20 feet. According to Officer Lara, as they drove closer, Mr. James made eye contact and "proceed[ed] to flee southbound" with his right hand inside of his coat pocket. Officer Lara stated that he briefly chased Mr. James, repeatedly yelling out "Chicago Police" and "Stop," but Mr. James continued running, never taking his hand out of his pocket. When they reached a vacant lot, Mr. James tossed a blue steel handgun to the ground and was apprehended as he tried to jump a chain link fence. Officer Lara further testified that, while processing Mr. James at the station, he noticed that Mr. James was having trouble speaking and ordered him to spit out whatever was in his mouth. Mr. James spit out a knotted plastic bag containing 15 orange tablets.

¶ 14 Forensic drug chemist Jaime Hess testified that she tested 11 of the tablets and they tested positive for BZP.

¶ 15 The State also introduced a certified document stating that a search of FOID files revealed that no FOID card had ever been issued to Mr. James.

¶ 16 Before closing arguments, the trial court gave the jury the following admonishment:

> "What the lawyers say during the argument is not evidence and should not be considered by you as evidence. If a lawyer makes a statements [*sic*] that the not [*sic*] based on the evidence or reasonable inferences to be drawn from the evidence, you should disregard the statement.

> You are to rely on your own recollection of the evidence."

¶ 17 During her closing argument, the prosecutor made the following statements regarding Mr. James's flight from the police, to which defense counsel objected:

> "[Prosecutor:] Now, Officer Lara didn't get out of the vehicle. He hadn't even gone up to the defendant yet to do anything. He didn't even say anything to the defendant before the defendant literally looked at the officers and made eye contact, saw it was

Crown Victoria with the M plates, saw it was a police vehicle, police officers are sitting in the vehicle—

MS. PAYETTE [defense counsel]: Objection, Judge.

THE COURT: Overruled.

MS. CUYLER-SHERMAN [prosecutor]: —and because of the choices that he had made knowing that he had this gun and he had these drugs, he made the choice to run. Now by law, you can consider that flight because flight is consciousness—

MR. BEDI [defense counsel]: Objection.

THE COURT: Overruled.

MS. CUYLER-SHERMAN [prosecutor]: —of guilt. Flight is consciousness of guilt. Why did the defendant, when he saw the officers look at the them [*sic*] and take off running? Because of the consciousness of his guilt. He knew that he had the gun. He knew he had the drugs and so he ran.

Now as the defendant ran, Officer Lara gets out of that car and he is going to give chase. He is a trained officer who is on that tactical team and he knows that the defendant isn't [*sic*] running because he didn't do something good.

MS. PAYETTE [defense counsel]: Objection.

THE COURT: Counsel, overruled. Ladies and Gentlemen, if an attorney makes a misstatement of facts of [*sic*] law, you are to disregard that. You have your own recollection of the evidence. This is argument. It is not evidence. It should not be considered by you as such."

¶ 18    In its rebuttal argument, the State also called on the jury to reject defense counsel's argument that the officers lied about the events of November 28, 2012:

"[Prosecutor:] *** I wanted to make one larger point about the things that they said makes [*sic*] no sense and *** you have to conclude that Officer Lara was lying to you.

And the larger point is why. Why? *** Did you hear any testimony or any evidence whatsoever that contradicted what Officer Lara told you happened—

MR. BEDI [defense counsel]: Objection.

THE COURT: Overruled.

MR. PIWOWARCZYK [prosecutor]: —in that vacant lot. They want you to reject the testimony of Officer Lara, even though it is completely uncontradicted and even though there's been absolutely no evidence whatsoever presented for him to have any motive to lie about this defendant.

MR. BEDI [defense counsel]: Objection.

MR. PIWOWARCZYK [prosecutor]: —and what that defendant did—

THE COURT: Overruled.

MR. PIWOWARCZYK [prosecutor]: *** That is an insult to your common sense. Common sense tells you that armed violence happens in Chicago every single day.

MS. PAYETTE [defense counsel]: Objection.

THE COURT: Overruled.

MR. PIWOWARCZYK [prosecutor]: —and the police do not—common sense tells you armed violence happens in the City of Chicago every single day, all the time

and the police don't have to concoct it. They don't have to invent it. It's out there happening. And common sense tells you that this third district tactical team, these officers who drew focus on guns and drugs and gangs, they have their hands full.

They had their hands full on November 28, 2012, and they had their hands full every single night doing things like rushing to the scene of a robbery—

MR. BEDI [defense counsel]: Objection.

MR. PIWOWARCZYK [prosecutor]: —looking for possible—

THE COURT: Sustained. Ladies and gentlemen of the jury, you heard the evidence in this case. Any misstatements of the facts, the evidence, reasonable inferences are allowed to be drawn by the attorneys.

Mr. Piwowarczyk, continue your argument.

MR. PIWOWARCZYK [prosecutor]: Thank you, Your Honor. The reasonable inference here, ladies and gentlemen of the jury, the reasonable inference [is] that these officers *** are trying to do their part to make sure that November 28, 2012, didn't become the next national news story.

MS. PAYETTE [defense counsel]: Objection.

MR. BEDI [defense counsel]: Objection.

MR. PIWOWARCZYK [prosecutor]: Chicago violence—

THE COURT: Sustained. Stricken. Continue with your argument, Mr. Piwowarczyk."

¶ 19     After closing arguments, the trial court again instructed the jury that closing arguments were not evidence and that arguments not based on the evidence or reasonable inferences that could be drawn from it should be disregarded. The court further instructed the jury that it should not concern itself with the reasons for the court's rulings on objections but should instead simply "disregard questions and exhibits which [were] withdrawn or to which objections were sustained."

¶ 20     Following deliberations, the jury found Mr. James guilty of armed violence, possession of a controlled substance, and AUUW.

¶ 21     Mr. James filed a motion for judgment of acquittal or for a new trial in which he argued that "[t]he Court erred during *voir dire* and jury selection" by "not asking individual jurors about their feelings about guns in light of the charges against [him]" and the "State's Attorneys made improper arguments," including arguing "law that was not before the jury and for which jurors would receive no instruction on" and telling the jury that officers were preventing "the next national news story." According to Mr. James, the latter statement, although stricken, still "impaired the jurors' ability to be fair and impartial and compelled them to return a verdict of guilty based on fear and emotion." In connection with the motion, defense counsel attached news articles relating to gun violence in Chicago and, at the hearing on the motion, she pointed out that the trial in this case took place two weeks after Chicago had experienced the "bloodiest" Fourth of July weekend and was considered to be "the gun capital of the country." Defense counsel insisted that the prosecutor's statements during rebuttal argument implied that the jury should find Mr. James guilty "because of their emotions and fear that he would somehow get out and contribute to this climate."

¶ 22     The State objected to the introduction of the news articles, which it claimed were not relevant; argued that the comment about the officers' motivations was an appropriate response

to defense counsel's accusations that the officers lied; and, moreover, pointed out that the objection to the comment was sustained and the comment was stricken.

¶ 23    The trial court denied Mr. James's motion. It rejected his argument that *voir dire* in this case was insufficient, explaining that, unfortunately, gun violence in Chicago was "nothing new." The court stated that, although the weekend preceding Mr. James's trial may have been more violent than usual, gun violence "was not new or shocking on that particular weekend," such that "jurors were in any way swayed about the fear of violence escalating if Mr. James was out on the street or not." The court also rejected Mr. James's arguments regarding the prosecutor's statements in closing and rebuttal arguments. It noted that there is no pattern jury instruction on flight and no need for one because evidence of flight is just one type of evidence from which a jury may draw reasonable inferences, concluded that the prosecutor's reference to the "next national news story" did not in any way necessitate a judgment notwithstanding the verdict, and found that any prejudice stemming from the comment was negated by appropriate corrective measures.

¶ 24    At Mr. James's sentencing hearing on September 10, 2014, the State noted that the findings of guilt on the charges of AUUW and possession of a controlled substance should merge into the finding of guilt for armed violence, but also indicated that concurrent sentences should be imposed. The trial court sentenced Mr. James to 15 years of imprisonment followed by 3 years of mandatory supervised release for armed violence, 3 years of imprisonment followed by 1 year of mandatory supervised release for possession of a controlled substance, and 3 years of imprisonment followed by 1 year of mandatory supervised release for AUUW.

¶ 25                                    JURISDICTION

¶ 26    Mr. James was sentenced by the trial court on September 10, 2014, and timely filed his notice of appeal that same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case. Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 27                                      ANALYSIS

¶ 28    On appeal, Mr. James argues that (1) the trial court abused its discretion by failing to inquire during *voir dire* regarding potential jurors' feelings about guns, (2) statements made by the prosecutor during closing and rebuttal arguments denied Mr. James a fair trial, (3) under the one-act, one-crime rule, Mr. James's convictions for possession of a controlled substance and AUUW should be vacated, and (4) the trial court erroneously failed to order 303 days of presentence credit for sanitation work that Mr. James completed while he was incarcerated. We address each argument in turn.

¶ 29                                    A. *Voir Dire*

¶ 30    Mr. James first argues that the trial court abused its discretion when it denied his request to question potential jurors regarding their feelings about guns. Mr. James asserts that, due to the acute public consciousness of gun violence, especially in Illinois, and extensive media coverage about the rash of gun violence in Chicago in the days preceding his trial, it was likely that at least some potential jurors harbored a bias against guns. In response, the State insists

that the trial court properly exercised its discretion in refusing Mr. James's requested area of inquiry and conducted *voir dire* pursuant to the requirements of Illinois law and in a manner that created a reasonable assurance that prejudice would have been discovered if present.

¶ 31    Both the United States and Illinois Constitutions require that, where a jury trial is provided, the defendant must be tried by a jury free from bias or impartiality. *Morgan v. Illinois*, 504 U.S. 719, 727 (1992); Ill. Const. 1970, art. I, § 8. "The purpose of *voir dire* is to ascertain sufficient information about prospective jurors' beliefs and opinions so as to allow removal of those members of the venire whose minds are so closed by bias and prejudice that they cannot apply the law as instructed in accordance with their oath." *People v. Cloutier*, 156 Ill. 2d 483, 495-96 (1993). However, our supreme court has made it clear that *voir dire* is "not to be used as a means of indoctrinating a jury, or impaneling a jury with a particular predisposition." *People v. Bowel*, 111 Ill. 2d 58, 64 (1986).

¶ 32    Illinois Supreme Court Rule 431 provides that the trial court shall examine prospective jurors with questions it deems appropriate to determine their qualifications to serve as jurors in the case. Ill. S. Ct. R. 431(a) (eff. July 1, 2012). "[D]epending upon the length of examination by the court, the complexity of the case, and the nature of the charges," the trial court may allow the parties to submit additional questions to the venire for further inquiry if appropriate, and "shall permit the parties to supplement the examination by such direct inquiry as the court deems proper for a reasonable period of time." *Id.* The determination of which questions are appropriate for *voir dire* rests in the sound discretion of the trial court. *People v. Strain*, 194 Ill. 2d 467, 476 (2000). An abuse of discretion occurs only when the trial court's ruling is "arbitrary, fanciful, or unreasonable" or where "no reasonable [person] would take the view adopted by the trial court." (Internal quotation marks omitted.) *People v. Illgen*, 145 Ill. 2d 353, 364 (1991). "[T]he test for evaluating the court's exercise of discretion is whether the means used to test impartiality have created a reasonable assurance that prejudice would be discovered if present." *People v. Peeples*, 155 Ill. 2d 422, 459 (1993).

¶ 33    As an initial matter, we are not convinced that Mr. James properly requested the *voir dire* inquiry that he argues the trial court improperly refused to make. The record reflects that defense counsel never submitted, and the trial court never rejected, any specific proposed question on this issue. Defense counsel merely asked whether any inquiry regarding potential jurors' feelings about guns—either in favor of or against them—was a part of the court's standard *voir dire* questions. When the court explained that it generally did not like to ask such questions for fear of a "ripple effect" that could influence other potential jurors, defense counsel did not press the issue. Although, on this record, there is no express ruling for us to review, the parties seem to agree that there was at least an implied ruling, as the trial court apparently also did when it denied Mr. James's posttrial motion. Therefore, we will analyze the issue before us as if the trial court denied a request by Mr. James to ask if potential jurors had a bias against guns or gun ownership. It is clear to us, however, that, viewing the issue in this way, there was no abuse of discretion in the trial court's handling of the *voir dire*.

¶ 34    This court's recent decision in *People v. Encalado*, 2017 IL App (1st) 142548, which Mr. James cites as supplemental authority, is instructive. In *Encalado* the defendant was charged with sexual assault and planned to offer, as part of his defense, testimony that the victims consented to the sexual contact in exchange for payments of cash and drugs. *Id.* ¶ 6. We held that the trial court erred in denying defense counsel the opportunity to ask about the potential jurors' feelings regarding prostitution, which would have allowed the defendant to "determine

- 9 -

whether the potential jurors could weigh the evidence against him, without a predisposition to find him guilty of criminal sexual assault because he patronized prostitutes." *Id.* ¶¶ 34, 37, 43. Importantly, at the time of *voir dire*, the potential jurors in *Encalado* had no reason to know that prostitution would be an issue at trial.

¶ 35 In contrast, here the potential jurors were instructed at the outset of *voir dire* that the charges brought against Mr. James included the illegal possession of a firearm. They were then asked whether they could consider all of the evidence and apply the law in a fair and impartial manner. Given what they knew, it was reasonable to expect prospective jurors to respond to this general question by volunteering information concerning any gun-related biases they might have harbored. Mr. James's contention that courts have found such "broad-scope questions" to be "irrelevant" or otherwise insufficient is misplaced. In the cases he relies on for this proposition, the potential jurors were, like the jurors in *Encalado*, unaware that the case would involve a particular controversial subject matter and thus could not have been expected to volunteer information regarding any bias they might have held relating to that subject in response to the court's general questions. See *People v. Stack*, 112 Ill. 2d 301, 313 (1986) (noting that asking potential jurors if they would follow the law as instructed was of limited value where they had no reason to know that would include the law governing a "controversial defense" like insanity); *People v. Lanter*, 230 Ill. App. 3d 72, 76 (1992) (where potential jurors did not know the defendant would assert intoxication as a defense, they could not be expected to volunteer information regarding bias against intoxicated persons when asked if there was anything about "the nature of the charges" that would affect their ability to be fair and impartial).

¶ 36 In addition to the trial court's general questions, potential jurors in this case were also specifically probed regarding their experiences, or the experiences of those close to them, as victims of crimes and, following additional *in camera* questioning, three individuals with direct or indirect experiences with gun violence were removed from consideration. Under these circumstances, the trial court's questioning of the prospective jurors created a reasonable assurance of impartiality. Courts have refused to hold that the failure to ask a specific question during *voir dire* aimed at uncovering a particular hidden bias was an abuse of the trial court's discretion where, as here, the court asked other questions that served to adequately probe the venire for that bias. See, *e.g.*, *People v Morales*, 329 Ill. App. 3d 97, 113 (2002) (holding a trial court did not abuse its discretion by refusing to ask potential jurors whether they thought a drug dealer was more likely to commit murder when it instead asked: " '[W]ould you be able to put aside your feelings about crimes not charged here such as drug dealing and base your verdict solely on the evidence concerning the crimes charged?' "), *rev'd on other grounds*, 209 Ill. 2d 340 (2004).

¶ 37 Mr. James also relies heavily on *People v. Strain*, 194 Ill. 2d 467, 470-73, 477 (2000), in which our supreme court held that, in a case where gang membership and gang-related activity was an integral part of the trial, the trial court abused its discretion in refusing to ask whether any potential juror "would find [the] defendant less believable if the juror learned that [the] defendant belonged to a gang." Unlike the potential jurors in *Encalado*, but like those in this case, the venire in *Strain* knew that the defendant's trial would involve a controversial subject matter. The trial court advised the potential jurors that there would be evidence of gang involvement introduced at trial and asked them if they or any of their family or close friends " 'had any involvement with a gang' " and whether they could "be fair to both sides." *Id.* at

470-71. Holding that it was an abuse of discretion for the trial court to refuse a specific follow-up question—whether the potential jurors would find the defendant less credible if they learned that *he* belonged to a gang—our supreme court reasoned that a prospective juror might have truthfully answered that he or she had no involvement with gangs and could generally be fair, but still harbored a hidden bias against gang members that might affect that juror's ability to believe the defendant's testimony at trial. *Id.* at 471, 480-81. As both the appellate court and the supreme court in *Strain* stressed, " '[a] question should not depend upon the prospective juror to volunteer information that does not fall within the question's scope.' " *Id.* at 480 (quoting *People v. Strain*, 306 Ill. App. 3d 328, 336 (1999)).

¶ 38    Although the potential jurors in *Strain* generally knew that the trial would involve a controversial subject and were asked one question touching on that subject, our supreme court concluded that a more specific follow-up question was necessary because, as in *Encalado*, *Stack*, and *Lanter*, the potential bias at issue in *Strain* still lay outside the scope of the trial court's questions. *Id.* Potential jurors were unaware that the defendant was a gang member or that they would be called upon to assess his credibility as one at trial. Here, the venire not only knew that the case would involve a gun, but specifically that Mr. James was charged with illegally possessing a gun. We can conceive of nothing more that potential jurors needed to know to bring any relevant gun-related bias within the scope of the trial court's general question, asking them whether they could consider all of the evidence and apply the law as instructed in a fair and impartial manner.

¶ 39    Ultimately, Mr. James's reliance on *Strain* fails because *Strain* dealt with specifics and Mr. James argues only generalities. The *Strain* court considered whether a very specific prejudice—a potential juror's inability to objectively assess the defendant's credibility as a witness because of his status as a gang member—came within the scope of the court's questions or whether an additional, very specific, question was needed to uncover that prejudice. Here, Mr. James's arguments on appeal—in which he alternatively refers to "prejudices regarding guns," "bias about gun possession," "possible bias about gun possession and its attendant violence," and "prejudice[ ] against illegal gun owners"—fail to clearly identify a specific hidden bias that lay outside the scope of the court's questions. Likewise, defense counsel's general inquiry just prior to *voir dire*, in which he asked whether the trial court's general practice was to "ask [potential jurors] about any strong feelings about guns one way or the other," failed to articulate any specific question that the jury was not, but should have been, asked in order to uncover the feared bias.

¶ 40    In sum, Mr. James has failed to convince us that any relevant gun-related bias would not have been uncovered by the trial court's general question regarding fairness and impartiality—coupled with the fact that the venire understood that Mr. James faced charges of illegally possessing a gun—and its additional questions addressing whether potential jurors or their close friends or family members had been victims of crimes. Under the circumstances of this case, the trial court's questioning of the prospective jurors created a reasonable assurance of impartiality.

¶ 41    Mr. James's reliance on the removal for cause of Dr. Samarel to support his proposition that "[t]he inherent bias of this juror suggests that others may have felt the same way" does not persuade us otherwise, but serves only to confuse the issues. Dr. Samarel was not dismissed because of any bias against guns—indeed, he stated that he was a gun-owner himself. Rather, the trial judge's comments indicate that she excused this juror for cause because, in her view,

he evinced a desire not to serve on a jury, despite the fact that his answers to her questions made it clear to her that he *"*[was] *not* prejudiced against guns." (Emphasis added.) Dr. Samarel said that he was biased against *illegal* gun possession, but that is the very crime Mr. James was charged with, not some matter extraneous to that charge or the facts bearing on Mr. James's guilt or innocence. Since the purpose of *voir dire* is to uncover jurors who will not be able to "apply the law as instructed in accordance with their oath" (*Cloutier*, 156 Ill. 2d at 495-96), there was no need in this case to uncover jurors who were opposed to illegal gun ownership. To the contrary, the law that was given to them was that illegal gun ownership is a crime.

¶ 42 Although we reject Mr. James's arguments, we emphasize that we also do not think this issue involves, as the State suggests, a simple application of our supreme court's decision in *People v. Howard*, 147 Ill. 2d 103 (1991). In *Howard*, the court held that the trial court's refusal to question the venire regarding handguns was not an abuse of discretion because handguns were not an issue central to the case. *Id.* at 135. As Mr. James correctly notes, *Howard* does not categorically foreclose questions about guns during *voir dire*. Rather, *Howard* reflects the general principle that the necessary questions in any *voir dire* depend upon the specific facts of the case, which must be considered as a whole. In this case, unlike *Howard*, the possession of a gun was clearly a central issue in Mr. James's trial. Nevertheless, for the reasons set out above, we agree with the State that the questions and process the trial court used to select the jury created the necessary "reasonable assurance that prejudice would be discovered if present." *Peeples*, 155 Ill. 2d at 459.

¶ 43 B. The State's Closing and Rebuttal Arguments

¶ 44 Mr. James also argues that he was denied a fair trial because, in its closing and rebuttal arguments, the State misstated the law and improperly played on prejudices that the jury may have harbored against guns and gun violence.

¶ 45 The parties acknowledge that our supreme court has made contradictory pronouncements regarding the appropriate standard of review for a trial court's refusal to grant a new trial because of alleged prosecutorial misconduct during closing argument. Mr. James urges us to follow those cases applying *de novo* review. See, *e.g.*, *People v. Wheeler*, 226 Ill. 2d 92, 121 (2007) ("Whether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue this court reviews *de novo*."). The State, on the other hand, maintains that an abuse of discretion standard applies. See *People v. Blue*, 189 Ill. 2d 99, 128 (2000) ("The regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." (Internal quotation marks omitted.)). We need not decide which standard applies because, even if we do not afford the trial court discretion on this issue, we find that the State's comments either fall within the proper scope of argument or were cured by the court's instructions to the jury.

¶ 46 "Generally, prosecutors have wide latitude in the content of their closing arguments." *People v. Evans*, 209 Ill. 2d 194, 225 (2004). Persuasive argument is not only permitted but expected. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005). Accordingly, prosecutors are entitled to "comment on the evidence and any fair, reasonable inferences it yields [citation], even if such inferences reflect negatively on the defendant." *Id.* Improper remarks are only cause for reversal if they "engender substantial prejudice against a defendant such that it is

impossible to say whether or not a verdict of guilt resulted from them." *Wheeler*, 226 Ill. 2d at 123.

¶ 47                                    1. Misstatement of Law

¶ 48    Mr. James contends that the State misstated the law when it argued that his flight from officers was proof of his guilt. In support of his argument, Mr. James attempts to distinguish certain statements in the United States Supreme Court's opinion in *Illinois v. Wardlow*, 528 U.S. 119 (2000), that were relied on by the trial court in its denial of Mr. James's motion for a new trial. In *Wardlow*, the Court considered whether a defendant's headlong flight from the police in a high-crime area gave officers the reasonable suspicion of criminal activity necessary to justify a brief, investigatory stop of the defendant. *Id.* at 123-24. In holding that it did, the Court noted that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id.* at 124. Mr. James argues, as the Court noted in *Wardlow*, that people may flee for innocent reasons and the reasonable suspicion needed for a *Terry* stop is "considerably less than [a] preponderance of the evidence." *Id.* at 123-25. He argues that "evidence of flight was never meant to be used to prove the underlying criminal conduct beyond a reasonable doubt" and that "[t]he prosecutor's argument to the jury, that James's guilt [could] be proven beyond a reasonable doubt in part by his flight from the officers, was legal error."

¶ 49    We agree with the State, however, that the issue is not whether flight from police officers, on its own, constitutes proof beyond a reasonable doubt of a defendant's guilt. The issue is whether the State was entitled to argue that consciousness of guilt is a reasonable inference to be drawn from such conduct—that inference in turn constituting circumstantial evidence of the defendant's guilt. Our supreme court has repeatedly held that it is. See, *e.g.*, *People v. Harris*, 52 Ill. 2d 558, 561 (1972) (citing *People v. Wright*, 30 Ill. 2d 519, 523 (1964)). The State did not tell the jury that it could base its verdict solely on this inference, and there is no indication that the jury did so. The trial court thus did not err in denying Mr. James's objections or his motion for a new trial on this basis.

¶ 50                                    2. Rebuttal Argument

¶ 51    Mr. James also argues that a portion of the State's rebuttal argument—in which the prosecutor stated that "armed violence happens in the City of Chicago every day" and that the officers in this case were simply "trying to do their part to make sure that November 28, 2012, didn't become the next national news story"—was improper because it was not based on the evidence presented at trial. Mr. James contends that these remarks denied him a fair trial. We reject this argument.

¶ 52    Even if the prosecutor's comments were improper, Mr. James has not convinced us that they played a role in his conviction. Reversal based on prosecutorial misconduct is only warranted where a prosecutor's remarks constituted a material factor in the defendant's conviction. *Wheeler*, 226 Ill. 2d at 123. Here, the trial court immediately sustained Mr. James's objections when the prosecutor referred to the officers having "their hands full" and to their goal of preventing the "next national news story." The court reminded the jurors, after the first of these comments, that it was their role to hear the evidence, and the court specifically struck the second comment. In addition, the court admonished the jury both before and after closing arguments that statements made by the lawyers were not evidence and should be disregarded if

they were not based on the evidence or on reasonable inferences that could be drawn from the evidence. The jury had also previously been admonished that any comment stricken from the record should be "completely disregarded" and "erased from [their] mind[s] just as if it was never spoken." Absent evidence to the contrary, a jury is presumed to have followed such instructions. *People v. Taylor*, 166 Ill. 2d 414, 438 (1995).

¶ 53    Mr. James relies on *People v. Lawler*, 142 Ill. 2d 548, 564-65 (1991), an example of a case in which a specific jury instruction—in that case, regarding the limited purpose for which the jury could consider the defendant's prior convictions—cured an improper argument by the State. However, that case does not support, as Mr. James suggests, his argument that the more general instructions given by the trial court in this case were insufficient for that purpose. Indeed, our supreme court has held that, in some instances, merely sustaining an objection to a line of argument is enough for a trial court to cure any ill-effects from an improper statement. See *People v. Stahl*, 26 Ill. 2d 403, 406 (1962) (holding any error stemming from the prosecutor's "ill-advised rhetoric" comparing a criminal trial with a game "was cured when the trial court sustained an objection to such line of argument").

¶ 54    Here, the challenged statements were also "brief and isolated" in comparison to the length of the State's closing and rebuttal arguments, a factor our supreme court has held to be "significant in assessing the impact of such remarks on a jury verdict." *People v. Runge*, 234 Ill. 2d 68, 142 (2009). See also *People v. Moody*, 2016 IL App (1st) 130071, ¶ 79 (rejecting the argument that "two isolated instances" of improper comments by the prosecutor constituted "a pervasive pattern of prosecutorial misconduct [that] deprived [the defendant] of a fair trial").

¶ 55    Moreover, we disagree with Mr. James's contention that the prosecutor's statements "could serve no purpose other than to ignite the jury's prejudice against guns and gun owners." As the State points out, the statements were made to rebut arguments made by the defense in both its opening statement and closing argument that officers fabricated the charges against Mr. James. Of course, improper comments do not become proper simply because they respond to the arguments of an opponent. As Mr. James points out, the "invited response doctrine" only permits a party to "right the scale by fighting fire with fire" where that party's opponent has already improperly incited the passions of the jury. *People v. Gorosteata*, 374 Ill. App. 3d 203, 221 (2007), *overruled on other grounds*, *People v. Chambers*, 2016 IL 117911. We need not assess the relative propriety of the parties' comments where, as discussed above, we are unconvinced that the prosecutor's comments, even if improper, played any role in Mr. James's conviction.

¶ 56    Mr. James argues that, because no evidence of *actual* violence was presented at trial, the prosecutor's statements about "armed violence" improperly "b[ore] no relation to the charges against [Mr.] James." But during *voir dire* and again during jury instructions, the jurors were informed that "armed violence" referred to a specific charge: here, possessing a controlled substance while also possessing a firearm. To the extent that the statements invoked the problem of actual violence in Chicago, we find, for the reasons discussed above, that any prejudice to Mr. James was cured when the court sustained defense counsel's objection and appropriately instructed the jury regarding the nature of closing arguments.

¶ 57    In sum, we cannot say that Mr. James was deprived of a fair trial based on any prosecutorial misconduct. The trial court promptly sustained defense counsel's objections, it properly instructed the jury with respect to the nature of closing arguments, the challenged statements were isolated rather than pervasive, and the record does not reflect that they were

made for the sole purpose of inciting the passions of the jury.

¶ 58                              C. One-Act, One-Crime Doctrine

¶ 59      Mr. James next contends, and the State agrees, that his convictions for AUUW and possession of a controlled substance (counts IV and VII, respectively), which were based on the same conduct as his conviction for armed violence (count I), should be vacated in accordance with the one-act, one-crime rule. Pursuant to that rule, when a defendant is convicted of more than one offense for the same physical act, a "sentence should be imposed on the more serious offense and the less serious offense should be vacated." *People v. Artis*, 232 Ill. 2d 156, 170 (2009). At the sentencing hearing, the State noted that counts IV and VII should merge into count I. Nevertheless, the mittimus reflects all three convictions, with separate sentences and periods of mandatory supervised release imposed for each. "Pursuant to Supreme Court Rule 615(b), this court may correct the mittimus without remanding the case to the trial court." *People v. Pryor*, 372 Ill. App. 3d 422, 438 (2007) (citing Ill. S. Ct. R. 615(b)). Accordingly, we vacate the trial court's entry of judgment on counts IV and VII and correct the mittimus to reflect, under count I, a single, Class X conviction for armed violence and a corresponding sentence of 15 years, plus 3 years of mandatory supervised release. As there is nothing in the record indicating that the vacated convictions had any effect on the separate sentence Mr. James received for armed violence, it is unnecessary for us to remand for resentencing. *People v. Shelton*, 252 Ill. App. 3d 193, 209 (1993).

¶ 60                                  D. Presentence Credit

¶ 61      Finally, Mr. James argues he is entitled to 303 additional days of presentence credit for sanitation work he performed while he was incarcerated. Subsection (c-5) of section 5-4.5-100 of the Unified Code of Corrections provides that "[t]he trial court shall give the defendant credit for successfully completing county programming while in custody prior to imposition of sentence at the rate specified in section 3-6-3 (730 ILCS 5/3-6-3)." 730 ILCS 5/5-4.5-100(c-5) (West 2014). Here, defense counsel requested the additional credit at Mr. James's sentencing hearing, and after some discussion, the trial court said that it would attach an order to the mittimus stating that the requested credit was "hereby ordered *** if eligible," thus leaving it to the Illinois Department of Corrections (DOC) to decide if the program Mr. James participated in qualified for such credit. No such order appears in the record. Although we agree with the State that there is nothing in the record from which we can ourselves determine Mr. James's eligibility for presentence credit, the trial court clearly intended to make a conditional award, subject to an eligibility determination by the DOC. "When the oral pronouncement of the court and the written order are in conflict, the oral pronouncement controls." *People v. Jones*, 376 Ill. App. 3d 372, 395 (2007). Accordingly, we revise the mittimus to reflect 303 additional days of presentence credit, if eligible.

¶ 62                                      CONCLUSION

¶ 63      For the foregoing reasons, we vacate Mr. James's convictions for possession of a controlled substance and AUUW and affirm his conviction for armed violence. We correct the mittimus accordingly and to reflect 303 additional days of presentence credit, subject to the DOC's determination of Mr. James's eligibility for such credit.

¶ 64        Affirmed in part, vacated in part; mittimus corrected.