2019 IL App (1st) 162908-U

No. 1-16-2908

Order filed November 19, 2019

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 12 CR 19485 |
| | ) | |
| DONYALL GARRETT, | ) | Honorable |
| | ) | Frank G. Zelezinski, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE COGHLAN delivered the judgment of the court.
Justices Lavin and Pucinski concurred in the judgment.

**ORDER**

¶ 1     *Held*: The evidence was sufficient to sustain defendant's convictions for attempt murder. The trial court did not abuse its discretion in admitting three witnesses' prior statements of identification, in allowing the State to make certain comments during closing arguments, or in responding to the jury's questions during deliberation. Although the court did not admonish the jury in accordance with Illinois Supreme Court Rule 431(b), such error did not rise to the level of plain error because the evidence was not closely balanced.

¶ 2     Defendant and codefendants Brandon Carter, Quinton Johnson, and Dwayne Robinson were each charged in the same indictment with the attempt first degree murders of Christan

Pickett (Christan), Capri Pickett (Capri), and David Shirley (Shirley) (720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1) (West 2012)). Defendant and Brandon Carter were tried simultaneously in front of the same jury. Carter was convicted of three counts of attempt murder. Quinton Johnson was tried and acquitted in a bench trial prior to the start of defendant's trial. Neither Carter, Johnson, nor Robinson is a party to this appeal.

¶ 3    Following a jury trial, defendant Donyall Garrett was sentenced to concurrent terms of 28 years of imprisonment for the attempt murder of Capri Pickett, 24 years for the attempt murder of Christian Pickett, and 26 years for the attempt murder of David Shirley. Based on a finding of serious bodily injury to one of the victims, the 28-year sentence ran consecutively to the other sentences, which ran concurrently to each other. Defendant now appeals, arguing that (1) the evidence was insufficient to establish his accountability for the attempt murders, (2) the trial court erred by allowing the State to introduce inadmissible hearsay, (3) he was denied a fair trial by the State's closing argument, (4) the trial court erred in "refusing to answer" one of the jury's questions during deliberation, and (5) the trial court erred by failing to admonish the jury pursuant to Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

¶ 4                                    Trial

¶ 5    At trial, Christan testified that he was convicted of the manufacture and delivery of a controlled substance in 2010. He testified that on the night of the shooting, he was with "[his] Aunt Capri and David Shirley" who "was her boyfriend" at the time. After 11 p.m. on that date, Christan and Shirley picked Capri up from work in Shirley's Pontiac Bonneville and drove to a housing project in Robbins, Illinois in order to purchase loose cigarettes. Shirley was the driver, Capri was the front passenger, and Christan sat in the backseat. Upon arrival, Shirley parked the

Bonneville on the street and Christan exited to purchase the cigarettes. As Christan returned to the vehicle minutes later, four men emerged from a gangway across the street and approached him. He recognized two of the men as defendant and Carter, whom he knew as "Face" and "Droopy," respectively. Christan testified that he could tell that "something was going to be exchanged."

¶ 6 When the men reached the Bonneville, they "surrounded" Christan, who was standing by the passenger's side. Defendant stated that someone named "Easy" informed him that Christan had "snitched on" him, taken $5000 from defendant and told defendant that he should "take it up" with Christan. Defendant, Carter, and the other two men then drew firearms. Carter tapped on Capri's window with his weapon and threatened to "air [the Bonneville] out" if Shirley did not turn off the vehicle. Shirley started to drive away, and Carter shot Capri through the window. Shirley continued driving northbound, and Christan fled on foot. As Christan ran, he heard gunshots and bullets ricocheting around him. Christan ran to his cousin's house and got a ride home.

¶ 7 On April 12, 2012, Christan met with officers at the Calumet Park police station, where he identified defendant and Carter in separate photo arrays. The State introduced and published the photo array depicting Carter without objection, and Christan acknowledged writing, "He was one of the guys that shot" beneath Carter's photograph. When the State moved to admit the photo array depicting defendant, both Carter's and defendant's counsels objected on grounds that what Christan wrote on the photo array was "tantamount to a prior consistent statement." The court overruled the objection and allowed the State to publish the photo array, including allowing Christan to read that he had written "This is the man that approached me, started shooting at the

car, then at me, and [his] street name is Face" on the photo array. Christan also identified photographs in which he identified defendant and Carter during a subsequent meeting with police on April 18, 2012.

¶ 8    Video surveillance from the scene of the crime showed the Bonneville parked in the bottom left corner of the frame. Christan exits the vehicle and walks up the sidewalk, away from the camera. When he returns several minutes later, four men approach the Bonneville on foot from across the street. Three of the men are wearing dark clothing, and the other, whom Christan identified as defendant, is wearing a lighter gray sweater. Defendant and two of the others walk several feet ahead of the fourth man, whom Christan identified as Carter, but all four approach the Bonneville with a similar pace and direction. At this time, Christian is standing by the passenger's side of the vehicle.

¶ 9    When the four men reach the Bonneville, defendant approaches Christan from the front while the other three walk around the driver's side and approach Christan from behind. The men appear to argue with Christan near the passenger's side, and Carter appears to lean towards the front passenger's window. As the Bonneville starts to pull away, defendant extends his arm toward the vehicle and one of the men in dark clothing fires several gunshots at it. Christan flees on foot, and a different man in dark clothing chases after him while firing in his direction. As that shooter runs past defendant, defendant spins around and appears to pat him on the buttocks. The video does not clearly show whether defendant had a firearm.

¶ 10    On cross-examination, Christan acknowledged that he originally identified individuals nicknamed "Taytay" and "Bandit" as the other two gunmen during an interview with police on April 12, 2012. Christan explained in court that Taytay and Bandit were present at the housing

project that night, but were not involved in the shooting. Christan also acknowledged that he smoked two "blunts" of marijuana on the way to the housing project. He recalled that all of the gunmen had either black or chrome firearms, but could not remember which color defendant's was or where he drew it from. He did not see who fired at him as he fled.

¶ 11     Capri testified that, as Christan returned from purchasing the cigarettes, she noticed a group of four to six men "fastly approaching" from the gangway across the street. She identified defendant and Carter, whom she had previously known as "Face" and "Droopy," in court as two of the men.

¶ 12     When the group reached the Bonneville, defendant approached Christan and told him that "Officer 'Easy' said you snitched on me and he took five grand from me and he told me to take it up with you." Defendant, Carter, and the other men all drew firearms. Carter tapped on Capri's window with his firearm and told Shirley to "cut this mother f*** car off or we [are] going to blow it up." Capri ducked, and Carter fired a shot that entered the back of her arm and went into her lung. Shirley drove off, and Capri heard numerous gunshots strike the rear of the Bonneville as they sped away. Shirley tried to drive to the hospital, but the Bonneville's tires "ended up blowing out." Ultimately Shirley and Capri were taken by ambulance to the hospital.

¶ 13     On April 12, 2012, Capri identified defendant and Carter in separate photo arrays. Over defendant's objection, she testified at trial that she wrote, "This is the man that approached Chris[tan] first, then pulled out a gun, and flashed it to us" beneath defendant's photograph. She also identified a photograph of Shirley's Bonneville with a shattered rear windshield and three bullet holes in the trunk.

¶ 14    Capri did not recall seeing defendant speak to any of the other men in the group. He was the first man to draw his firearm, but she did not see him point it at anyone. Capri was unable to describe the weapon other than "[i]t appeared to be black" and she did not see who fired at the Bonneville as they drove away.

¶ 15    Shirley testified that a group of approximately five men approached his vehicle from across the street as Christan returned from purchasing the cigarettes. Shirley recognized defendant and Carter, whom he identified in court and knew by their nicknames, as two of the men. The group "split up" as they neared the Bonneville, and approached the vehicle from both sides. Defendant confronted Christan, who was standing by the passenger's side, and said, "Easy said you was out here snitching on me, I come to take it up with you." The other men in the group walked around the driver's side and approached Christan from behind. Shirley observed defendant, Carter, and one other man draw firearms. Carter tapped on the window with his weapon and told Shirley to "[t]urn [his] mother*** car off." Shirley activated his headlights, and Carter opened fire, hitting Capri.

¶ 16    Shirley sped away as gunshots rang out from behind. One of the shots shattered his rear windshield, but he did not see who was shooting. As Shirley turned out of the housing project, he realized his head was bleeding, reached up, and felt a bullet "sitting on top of [his] head." Shirley's trip to the hospital was interrupted, because his tires "got blown out."

¶ 17    Shirley identified defendant and Carter in separate photo arrays. Over defendant's objection, Shirley testified that he wrote "He had a [g]un" on the array depicting defendant and "He started shooting" on Carter's photo. Shirley admitted that he, Christan, and Capri each smoked one blunt of marijuana on the way to buy the cigarettes.

¶ 18    Illinois State Police sergeant Cary Morin processed Shirley's Bonneville at the Calumet Park police station on April 27, 2012. He observed a total of nine bullet holes in the vehicle: three in the lid of the trunk, three on the exterior of the passenger's side, and three in the ceiling liner above the driver's seat. Morin also recovered five bullets: three fired bullets from inside the trunk, one from the interior panel of the rear passenger's side door, and one from the ceiling above the driver's seat. The parties stipulated that forensic scientist Kurt Zielinski examined the five bullets and concluded that all five were 9-millimeter or .38-caliber bullets, and were fired from at least two different weapons. The State rested.

¶ 19    The jury found defendant guilty of the attempt murders of all three victims. The trial court denied defendant's posttrial motion on October 12, 2016, and the court sentenced defendant to 24 years in prison for the attempt murder of Christan, 28 years for the attempt murder of Capri, and 26 years for the attempt murder of Shirley. Based on its finding that Capri suffered serious bodily injury, the court ruled that the 28-year sentence would run consecutively to the other two sentences, which were to run concurrently with each other.

Sufficiency of Evidence

¶ 20    On appeal, defendant first argues that the State did not prove his accountability for the shooters' actions beyond a reasonable doubt. When faced with a challenge to the sufficiency of the evidence supporting a conviction, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *People v. Harris*, 2018 IL 121932, ¶ 26. The reviewing court does not retry the defendant or substitute its own judgment for the trier of fact's on matters of witness credibility, the resolution of conflicts in the evidence, and which

inferences to draw from the evidence. *Id.* Instead, the reviewing court will draw all reasonable inferences in the State's favor, and will reverse a conviction only if the evidence is "so improbable or unsatisfactory" that there remains a reasonable doubt as to the defendant's guilt. *Id.*

¶ 21 Relevant here, a defendant is guilty of attempt first degree murder when he or a person for whom he is legally accountable takes a "substantial step" towards killing the victim with the intent to cause death or great bodily injury. 720 ILCS 5/8-4(a) (West 2012); 720 ILCS 5/9-1(a)(1) (West 2012). A defendant is legally accountable for the conduct of another when, with the intent to "promote or facilitate" the commission of an offense, the defendant "solicits, aids, abets, agrees or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012). Although mere presence is insufficient to establish accountability for an offense, a defendant need not actively participate in the commission of the offense. *People v. Taylor*, 164 Ill. 2d 131, 140 (1995). "One may aid and abet without actively participating in the overt act." *Id.* A defendant's intent to promote or facilitate an offense may be proven through evidence that the defendant either shared the intent of the principals or entered into a common criminal design with them. *People v. Fernandez*, 2014 IL 115527, ¶ 13. A common design need not be supported by words of agreement, but may be inferred from the circumstances surrounding the commission of the offense. *Taylor*, 164 Ill. 2d at 141.

¶ 22 Here, the evidence established that defendant had a motive to kill Christan, as all three victims heard defendant tell Christan that he had "snitched" on him and cost him $5000 immediately before the shooting. Second, the video shows that, when Christan returned to the Bonneville, defendant and the other men emerged from the same location at the same time and

approached the vehicle with a similar direction and speed. Upon reaching the Bonneville, the group surrounded Christan by the passenger's side. Defendant also pointed at the vehicle as it began to drive away, remained with the shooters once they opened fired, and appears to have given one of the gunmen an encouraging pat on the buttocks as that man fired at Christan. While defendant contends that the video shows that he did not point at the Bonneville or touch any of the shooters, a rational jury could have concluded that he aided or abetted the shooters.

¶ 23    Although defendant also argues that there was no evidence that he knew or had ever spoken to the shooters, the State was not required to present direct evidence of a verbal agreement or plan. *People v. Garcia*, 2019 IL App (2d) 161112, ¶ 27. A common criminal design may be inferred from the circumstances surrounding the offense. *Id.* As we have explained, the video and testimony clearly demonstrated that defendant acted in concert with the gunmen.

¶ 24    Similarly, there is no merit to defendant's argument that he did nothing to facilitate the offenses. Although defendant did not personally fire a weapon, his actions could reasonably be interpreted as encouraging the gunmen. The evidence shows that defendant was an active participant in the events leading up to the shooting, as he approached the victims with the gunmen, confronted Christan about being snitched on and losing money, and drew a firearm around the same time as the other men. Under these circumstances, the evidence was sufficient to find defendant legally accountable for the shots fired by his companions.

¶ 25                        Admissibility of Prior Consistent Statements

¶ 26    Defendant next argues that the State improperly bolstered the witnesses' credibility through statements they wrote on the respective photo arrays in which they identified defendant to police. Specifically, Christan testified that he wrote, "This is the man that approached me,

started shooting at the car, then at me, and [his] street name is Face" beneath defendant's photograph. Capri testified that she wrote, "This is the man that approached Chris[tan] first, then pulled out a gun, and flashed it to us" beneath defendant's photograph. Shirley testified that he wrote, "He had a Gun" beneath defendant's photograph. The State also published the photo arrays with these annotations. The State maintains that the statements were properly admitted as prior identifications pursuant to section 115-12 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-12) (West 2012)).

¶ 27    As an initial matter, defendant concedes that he has forfeited this argument by failing to include it in his posttrial motion. Nevertheless, he urges us to review the issue under the first prong of the plain error doctrine, or, alternatively, as a matter of ineffective assistance of counsel. Under the first prong of the plain error doctrine, a reviewing court may consider an unpreserved error if the defendant demonstrates that (1) a clear or obvious error occurred, and (2) the evidence was so closely balanced that the error alone threatened to tip the scales against him. *People v. Piatkowski*, 225 Ill. 551, 564 (2007). Similarly, a defendant asserting ineffective assistance of counsel must prove that (1) his counsel's performance was objectively unreasonable, and (2) there is "reasonable probability" that the result of the proceeding would have been different but for counsel's deficient performance. *People v. Moore*, 356 Ill. App. 3d 117, 121 (2005). Under either theory, a defendant must first establish that an error occurred. *People v. Cox*, 2017 IL App (1st) 151536, ¶ 52.

¶ 28    Generally, a party may not enhance the credibility of one of its witnesses through that witness's prior consistent statements. *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60. However, this rule does not apply to statements of identification. *People v. Temple*, 2014 IL App

(1st) 111653, ¶ 34. In particular, section 115-12 of the Code provides that "[a] statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2012). A trial court's decision to admit statements under section 115-12 of the Code will be reversed only if the court abused its discretion, such as when its decision is "arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position adopted by the trial court." (Internal citations omitted.) *Temple*, 2014 IL App (1st) 111653, ¶ 33.

¶ 29    Here, there is no dispute that Christan, Capri, and Shirley all testified at trial and were subject to cross-examination. Rather, the issue before us is whether the statements accompanying the photo arrays constituted "statements of identification." Our supreme court has defined the term "statements of identification" to broadly encompass "the entire identification process." *People v. Tisdel*, 201 Ill. 2d 210, 219 (2002). Thus, testimony admitted under section 115-12 of the Code may include a description of the offense and the offender's conduct, but only to the extent necessary to make the identification understandable for the jury. *People v. Anderson*, 2018 IL App (1st) 150931, ¶ 42.

¶ 30    Both parties cite our decision in *Anderson* in support of their respective arguments. There, the defendant was charged with murder and attempt murder under a theory of accountability in connection with a fatal shooting. *Id.* ¶ 2. At trial, a witness who saw the defendant holding a firearm testified regarding the written identifications he made on defendant's photo arrays. *Id.* ¶ 9. The State then displayed the photo arrays with the annotations on a video screen twice during direct examination and again in its closing argument. *Id.* ¶ 36. On appeal, we

held that (1) testimony about what the witness wrote on the photo arrays was admissible under section 115-12 of the Code, but (2) it was improper for the State to display the writing on three separate occasions, thus using the prior statements "essentially as a demonstrative exhibit." *Id.* ¶¶ 47-48.

¶ 31    Here, Capri testified she wrote that defendant "is the man that approached Chris[tan] first, then pulled out a gun, and flashed it to us." Shirley testified that he wrote simply that defendant "had a [g]un." As in *Anderson*, these statements were admissible under section 115-12 of the Code because they contained the minimal amount of detail necessary for the jury to understand defendant's role within the group of offenders. We also find that Christan's statement that defendant "is the man that approached me, started shooting at the car, then at me, and [his] street name is Face" was similarly limited to providing necessary context for the jury.

¶ 32    Citing *Anderson*, defendant also argues that it was improper for the State to publish the photo arrays, which included the challenged annotations. Unlike *Anderson,* however, the State did not dwell on the out-of-court statements or emphasize them in its closing argument. We also note that, in *Anderson*, we found the State's use of a witness's prior consistent statements as a "demonstrative exhibit" to be "particularly prejudicial" because the evidence was closely balanced on whether the defendant supplied the murder weapon, which was critical to the State's case. *Id.* at ¶ 49. Here, in contrast, there were three witnesses who testified that they saw defendant with a firearm, and no witnesses denied that defendant was armed.

¶ 33    Despite defendant's assertion that the State's theory of accountability "completely (falls) apart," we find that evidence of defendant's guilt was overwhelming irrespective of whether he had a firearm. Unlike in *Anderson*, the State's theory here did not hinge on the allegation that

defendant personally attempted to discharge a firearm or supplied the murder weapon. Under these circumstances, no error occurred and defendant failed to meet his burden under the first prong of the plain error doctrine or a claim of ineffective assistance of counsel.

¶ 34                                    Closing Argument

¶ 35    Defendant also argues that the State denied him a fair trial by mentioning facts not in evidence during closing argument. During the State's argument, the prosecutor emphasized the surveillance video, contending that it revealed that defendant "organize[d] his kill team" upon seeing Christan at the housing project, and that defendant was "the leader" because "[t]his is his beef. This is his show." The prosecutor also argued, *inter alia*, that the way defendant, Carter, and the other two men approached the Bonneville showed that they were "acting together to carry out their intent to kill" Christan, Capri, and Shirley, and that Carter's actions showed that he "knows the plan."

¶ 36    In response, defendant's counsel argued that the man whom the victims identified as defendant in the video did not have a firearm and that there was "no evidence in this case to show that he knew the people, that there was some type of agreement between him and the people, [or] that they *** ever had any discussions, any conversations, any plans." Rather, counsel argued that the man identified as defendant was "almost *** shot himself" and just "st[ood] stunned, not moving."

¶ 37    In rebuttal, the prosecutor argued that the video showed otherwise:

"[ASSISTANT STATE'S ATTORNEY]: [The video] captures [defendant] who, of course, has nothing to do with this. Let's see. When the guy runs past him, go get him, boy . . . That's not somebody who is about to get shot. That's somebody who's saying go

finish the job." The prosecutor also noted that the video showed a passerby in the corner of the screen, ducking and running when the shooting begins. The prosecutor stated that is what an "innocent [person] does. They don't smack their buddy on the butt saying go get him."

¶ 38 Defense counsel objected on grounds that there was "no such evidence" that defendant spoke to the gunmen, and the court sustained the objection.

¶ 39 First, defendant contends that the State's comments that he "organize[d] his kill team," was "the leader," and that Carter "knows the plan" were not supported by any evidence of a prior agreement among the offenders. Defendant concedes that he did not object to these comments during the State's closing. "To preserve claimed improper statements during closing argument for review, a defendant must object to the offending statements both at trial and in a written posttrial motion." *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). Accordingly, he has forfeited his challenges to the State's comments in its initial argument.

¶ 40 Defendant requests that we review the unpreserved challenges under the first prong of the plain error doctrine or as a matter of ineffective assistance of counsel. However, a defendant must first establish that an error occurred in order to succeed on either of these theories. *Cox*, 2017 IL App (1st) 151536, ¶ 52.

¶ 41 A defendant faces a " 'substantial burden' " when attempting to obtain a reversal of his conviction based on the State's closing argument. *People v. Branch*, 2018 IL App (1st) 150026, ¶ 32 (quoting *People v. Moore*, 358 Ill. App. 3d 683, 693 (2005)). Although the State is afforded "wide latitude" during closing argument, it may not argue assumptions or facts not based on the evidence. *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 38. However, the State is free to

comment on the evidence and any reasonable inferences drawn therefrom, even if unfavorable to the defendant. *People v. Jackson*, 2012 IL App (1st) 092833, ¶ 42. The State's argument should be read as a whole, and its comments are not improper if they were provoked or invited by the defense's argument. *People v. Glasper*, 234 Ill. 2d 173, 204 (2009). Even where the State makes improper remarks during closing argument, reversal of a conviction is warranted only if the remarks "engender[ed] substantial prejudice against a defendant such that it is impossible to say whether or not a verdict of guilt resulted from them." *Wheeler*, 226 Ill. 2d at 123.

¶ 42    We find the challenged comments to be fair inferences based on the evidence. Specifically, the State's evidence established that defendant (1) had a clear motive to kill Christan, (2) approached him in a group with the shooters, (3) pointed at the Bonneville as it began to drive away, and (4) appeared to make an encouraging gesture towards one of the gunmen shooting at Christan. Thus, the State's argument was based on the evidence and not improper. Since no error occured, there was no plain error (*People v. Hillier*, 237 Ill. 2d 539, 549 (2010)), or ineffective assistance of counsel (*People v. Jackson*, 2018 IL App (1st) 150487, ¶ 42 (counsel's failure to object to comments made during closing argument is not deficient where the comments were proper)).

¶ 43    Defendant also asserts that the State's comment during rebuttal that Donyall told one of the men firing at the fleeing car "go get him boy" assumed a fact not in evidence, because there was no audio component to the video and no testimony that defendant said anything to the shooters. In context, it is clear that the State argued that defendant conveyed a message of encouragement by patting the shooter on the buttocks as he ran past. This was a fair inference drawn from the video, and was therefore proper. See *People v. Herndon*, 2015 IL App (1st)

- 15 -

123375, ¶ 36 (State may draw legitimate inferences from the evidence). The comment was also made in direct response to defense counsel's argument that, in the prosecutor's words, defendant had "nothing to do with this." See *Glasper*, 234 Ill. 2d at 204 (statements not improper if made in response to the defense's argument). Finally, the trial court specifically admonished the jury that "This is argument. It's not evidence." Absent evidence to the contrary, we presume that the jury followed such instructions. *People v. James*, 2017 IL App (1st) 143036, ¶ 52.

¶ 44　　Defendant also claims the State improperly remarked that defendant was "saying go finish the job" and "go get him." The trial court sustained defense counsel's objection and admonished the jury multiple times that closing arguments were not evidence and should be disregarded to the extent not supported by the evidence. This was sufficient to cure any ill effects of these comments. See *People v. Thompson*, 2013 IL App (1st) 113105, ¶ 92 (the prompt sustaining of an objection and a proper jury instruction is generally sufficient to cure any prejudice created from an improper closing argument).

¶ 45　　　　　　　　　　　　　　　　Jury Questions

¶ 46　　Defendant next argues that the trial court erred in responding to the jury's questions during deliberation. After arguments, the court admonished the jury that, "The evidence which you should consider consists only of the testimony of the witnesses and the exhibits and stipulations which the Court has received," and that, "Neither opening statements nor closing arguments are evidence and any statement or argument of the attorneys which is not based on the evidence should be disregarded." The court also instructed the jury on legal accountability in accordance with Illinois Pattern Jury Instructions, Criminal, No. 5.03 (4th ed. 2009), which explains that a defendant is legally accountable for an offense committed by another when, with

the intent to promote or facilitate the offense, the defendant "knowingly solicits, aids, abets, agrees to aid, or attempts to aid" in the planning or commission of the offense.

¶ 47    After approximately 95 minutes of deliberation, the jury sent the following note to the trial judge:

"Questions for judge; first question, is a person guilty if a crime is committed and he is present[?] Then what if he is part of a group that commits a crime but doesn't commit the actual crime[?]"

¶ 48    The State argued that the jury had been adequately instructed on the law of accountability and should be told, "You heard the evidence. You have the law. Continue deliberations." Defense counsel argued that "the law is mere presence alone is not enough," and asked the court to respond "no" to the first question and "[you] have all of the evidence before [you] and will have to continue deliberating" to the second question. The court responded that the questions were "kind of vague" and that, although mere presence alone does not establish accountability for a crime, it did not want to answer "no" because "it almost seems that they're begging and possibly hinting there may be something further *** than just presence." The court proposed responding that the jury should refer to the accountability instruction it had already received.

¶ 49    Defense counsel argued that the court's proposal "doesn't answer the question," and maintained that "the answer should be no" because "[m]ere presence is not enough." The court stated that counsel's proposal was "an incomplete answer" based on the context of the question, and that the accountability instruction adequately explained the applicable law. The court ruled that it would advise the jury that, "[Y]ou have received all appropriate instructions. Please

consider *** all the instructions and continue to deliberate." The trial court stated that "[t]here is no agreement between the parties here," noting defense counsel's objection for the record.

¶ 50    Defendant argues that the court should have answered "no" to the first question because a person's mere presence at the crime scene is insufficient to establish his legal accountability for an offense. The State maintains that it was within the trial court's discretion to refer the jury to its original instructions because the instructions were readily understandable and fully explained the relevant law.

¶ 51    Initially, the State contends that defendant has waived any challenge to the court's response because he "acquiesced" to it by failing to object in the trial court. However, the record shows that the court clearly understood that the revised response, which it ultimately delivered, remained inconsistent with defense counsel's initial position. Indeed, in its final ruling, the court stated that "[t]here is no agreement between the parties here," and that counsel's objection was made for the record. Thus, defendant did not waive his challenge to the court's response, and we will consider his argument on the merits.

¶ 52    Although a trial court has a general duty to clarify points of law in response to an "explicit question" demonstrating the jury's confusion, the court may nevertheless decline to answer the question under "appropriate circumstances." *People v. Millsap*, 189 Ill. 2d 155, 160 (2000). Such appropriate circumstances exist where the court's jury instructions were "readily understandable and sufficiently explain the law," where additional instructions might mislead the jury, or where an answer would cause the court to express an opinion that would likely direct the jury to reach a certain verdict. *People v. Averett*, 237 Ill. 2d 1, 24 (2010). The decision on how to

respond to a jury's question is within the sound discretion of the trial court. *People v. Nash*, 2012 IL App (1st) 093233, ¶ 39.

¶ 53    Here, defendant concedes that the trial court accurately instructed the jury on the law of accountability, but argues that the court was required to give further instruction because the jury's questions showed that it was confused about the law. The crux of defendant's argument is his characterization of the jury's first question as asking "whether a person is guilty of a crime when he is merely present." Thus, defendant concludes that the jury was considering convicting him based on his mere presence at the scene, and might have acquitted him had the court correctly instructed the jury that mere presence was insufficient. However, the words "mere presence" do not appear in either of the jury's questions, and the trial court explicitly rejected defendant's characterizations. Rather, the court observed that the jury's reference to defendant's presence was asked in conjunction with its further question of whether a defendant would be guilty "if he is part of a group that commits a crime but doesn't commit the actual crime." The court concluded that the jury's two-part question was "vague," but that the jury was possibly contemplating "something further" than mere presence. Accordingly, the court reasoned that a definitive "no" was an "incomplete answer" that would mislead the jury from the proper explanation of the law contained in its accountability instruction. We cannot say that the court's interpretation of the jury's questions was unreasonable, or that the court abused its discretion in refusing to adopt defense counsel's proposal. See *Averett*, 237 Ill. 2d at 24 (court may decline to answer a jury's question where it would mislead the jury or direct it towards a particular verdict).

¶ 54    Moreover, a trial court is not required to supplement the jury instructions where the instructions were "readily understandable and sufficiently explain[ed] the relevant law." *Id.* As

defendant acknowledges on appeal, we have held that a trial court need not give a "mere presence" instruction where, as here, the court also instructs the jury on Illinois Pattern Jury Instructions, Criminal, No. 5.03 (4th ed. 2009), as that instruction incorporates the "essence" of a mere presence instruction. *People v. Nutall*, 312 Ill. App. 3d 620, 609-610 (2000); see also *People v. Ayers*, 264 Ill. App. 3d 757, 760 (1993); *People v. Wilson*, 257 Ill. App. 3d 670, 697-98 (1993). Although defendant attempts to distinguish *Nutall* and similar cases on the basis that the present case implicates a trial court's more immediate duty to correct manifest confusion, we cannot say that the trial court abused its discretion in determining that its response was a better explanation of the relevant law than defendant's proposal.

¶ 55                            Illinois Supreme Court Rule 431(b)

¶ 56    Finally, defendant argues that the trial court erred by failing to comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). During *voir dire*, the trial court asked each potential juror, among other things, whether they understood and accepted that every defendant is presumed innocent, not required to present any evidence, and must be proven guilty by the State beyond a reasonable doubt. The court also individually asked each member of the venire, "In this case if a defendant decides that he doesn't want to testify on his own behalf, would you hold that against him?" All of the individuals who were selected for the jury stated that they understood and accepted the first three principles, and that they would not hold it against defendant if he decided not to testify. Defendant did not object to the questioning.

¶ 57    Defendant acknowledges that he forfeited the issue by failing to object in the trial court, but urges us to review his claim under the first prong of the plain error doctrine.

¶ 58    Rule 431(b) provides that a trial court "shall ask" each potential juror whether they understand and accept four fundamental principles: (1) that the defendant is presumed innocent, (2) that the State must prove the defendant guilty beyond a reasonable doubt, (3) that the defendant is not required to offer any evidence, and (4) that the defendant's decision not to testify cannot be held against him. Ill. S. Ct. R. 413(b) (eff. July 1, 2012). The rule "mandates a specific question and response process" to which the trial court must strictly comply. *People v. Thompson*, 238 Ill. 2d 598, 607 (2010). Thus, the trial court must ask each potential juror, either individually or as a group, whether they both understand and accept each of the principles. *People v. Wilmington*, 2013 IL 112938, ¶ 32. We review whether a trial court complied with the rule *de novo*. *People v. Belknap*, 2014 IL 117094, ¶ 41.

¶ 59    Here, there is no question that the trial court asked each member of the venire whether they understood and accepted three of the four principles. Defendant challenges the adequacy of the court's compliance with 413(b)(4) by asking each potential juror, "In this case if a defendant decides that he doesn't want to testify on his own behalf, would you hold that against him?" The record demonstrates the trial court did not ask whether the potential jurors understood the principle. This was clear error. See *Wilmington*, 2013 IL 112928, ¶ 32 ("While it may be arguable the court's asking for disagreement, and getting none, is equivalent to juror *acceptance* of the principles, the trial court's failure to ask jurors if they *understood* the four Rule 431(b) principles is error in and of itself." (emphases in original)).

¶ 60    Having determined that an error occurred, we must now consider whether the evidence was closely balanced, which is a "separate question from whether the evidence is sufficient to sustain a conviction." *Piatowski*, 225 Ill. 2d at 566. The determination requires a "qualitative,

commonsense assessment" of the totality of the evidence within the context of the case and the elements of the charged offense. *Sebby*, 2017 IL 119445, ¶ 53.

¶ 61    In the present case, defendant challenges the evidence only with respect to his accountability for the shooters' actions. As noted, a defendant is legally accountable for the conduct of another when, with the intent to promote or facilitate an offense, he "solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012). A defendant's intent to promote or facilitate an offense may be proved through circumstantial evidence that he either shared the intent of the principals or engaged in a common criminal design with them. *Fernandez*, 2014 IL 115527, ¶ 13.

¶ 62    A commonsense evaluation of the evidence presented in this case reveals that it was not closely balanced. All three of the eyewitnesses testified that defendant and the shooters approached the Bonneville together as Christan returned from purchasing the cigarettes. Defendant confronted Christan about having "snitched" on him and costing him $5000, while the other men walked around the driver's side of the vehicle and approached Christan from behind. Each of the eyewitnesses also testified that defendant and the shooters drew their firearms at around the same time, and that Carter tapped on the window with his weapon and demanded that Shirley turn his vehicle off. When Shirley instead began to drive away, Carter shot Capri. The shooters continued firing at all three victims as they fled. This account was corroborated by Morin's testimony, the photographs of the damage to the Bonneville, the forensic evidence that multiple firearms were involved, and, importantly, the surveillance video.

¶ 63    Defendant nevertheless contends that the evidence of his accountability was closely balanced because the State presented no direct evidence that he had any prior interaction with the

shooters. However, as we have explained, the State was not required to prove that he spoke to the gunmen prior to the offense. See *People v. Perez*, 189 Ill. 2d 254, 267 (2000) ("Words of agreement are not necessary to establish a common purpose to commit a crime."); see also *People v. Johnson*, 220 Ill. App. 3d 550, 554 (1991) (rejecting the defendant's argument that he was not accountable for an offense because, aside from approaching the victim together, there was "no evidence that he was 'acquainted' or had a 'prior connection' " to the principal). Here, defendant's intent to facilitate the shooting was overwhelmingly demonstrated by the testimony and video evidence. Since the evidence was not closely balanced, defendant's Rule 431(b) argument is forefeited.

¶ 64    In sum, the State presented overwhelming evidence of defendant's accountability for the shooting. Additionally, the trial court did not abuse its discretion in admitting the witnesses' prior statements of identification, in allowing the State's closing argument, or in responding to the jury's questions during deliberation. Although the court erred in admonishing the jury pursuant to Rule 431(b), such error did not rise to the level of plain error because the evidence was not closely balanced.

¶ 65    For the stated reasons, the judgment of the circuit court of Cook County is affirmed.

¶ 66    Affirmed.