2019 IL App (1st) 161205-U

SIXTH DIVISION
December 27, 2019

No. 1-16-1205

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 9409 |
| | ) | |
| DONNELL FLORA, | ) | Honorable |
| | ) | Thaddeus L. Wilson, |
| Defendant-Appellant. | ) | Judge Presiding. |

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justices Cunningham and Connors concurred in the judgment.

**O R D E R**

¶ 1     *Held*:    Defendant's convictions are reversed and this case is remanded for a new trial. Statements made by the prosecutor in closing arguments, ratified when the trial court overruled defendant's objections to those statements, misrepresented what the State had to prove for the jury to find defendant accountable for murder and attempted murder.

¶ 2     On April 28, 2014, two teenage girls, surrounded by friends and relatives, confronted each other after several months of exchanging threats and frightening taunts over social media. One of those girls, Destiny P., fired a gun she had obtained from her uncle, defendant Donnell Flora. The girl who had been taunting Destiny was only grazed in the arm but that girl's friend was killed.

Mr. Flora, who is wheelchair-bound, was on the other side of Garfield Boulevard when this confrontation happened because he could not go over the grassy median. He was charged and, following a jury trial, convicted on a theory of accountability of first degree murder and attempted first degree murder.

¶ 3    Mr. Flora argues on appeal that (1) the evidence was insufficient to prove beyond a reasonable doubt that he was accountable for Destiny's decision to shoot at her victims; (2) statements made during the prosecutor's closing argument, the court's rulings regarding those statements, and the objections that were sustained to his own closing argument misled the jury about what was required for it to find him legally accountable for Destiny's criminal conduct; and (3) defense counsel should have been allowed to cross-examine the State's jailhouse witness regarding his criminal history. If we do not reverse his convictions, Mr. Flora urges us to vacate his 100-year sentence as excessive. Because we agree that statements during the State's closing argument and the court's rulings on objections to those statements misled the jury regarding what was necessary to convict on the basis of accountability, we reverse Mr. Flora's convictions and remand for a new trial.

¶ 4                                    I. BACKGROUND

¶ 5    A five-day trial was held in this case, beginning on January 26, 2016. The evidence included testimony from numerous participants and observers of the confrontation, a cell phone video, forensic evidence, statements to the police, and the Mr. Flora's own account of what happened. It is summarized here only to the extent necessary to address the issues in this case, beginning with Mr. Flora's trial testimony.

¶ 6                          A. Mr. Flora's Testimony

¶ 7    Mr. Flora acknowledged in his trial testimony that he had a felony record of two guilty

pleas to possession of a stolen car, for which he was sentenced to 18 months of probation in 2007 and boot camp in 2009. Mr. Flora has five brothers and three sisters, all living except his brother Richard, Destiny's father, who was "[s]hot in the streets" in 2001, when Destiny was just an infant. Mr. Flora was himself shot and paralyzed from the waist down in 2010 and, as a result, is confined to a wheelchair. Mr. Flora described his relationship with Destiny as "very close." Throughout her life, he made a point to visit her several times a week at her mother's house and did things with her that her father would have. Although he lived with his uncle, at the time of the shooting Mr. Flora had been staying for two or three days at the home of his cousin, Vandetta Redwood, to do his laundry, because his uncle did not have a washing machine. He described his relationship with Vandetta as that of "[c]lose cousins"; they saw each other "[p]robably three times a month." Although Vandetta is also Destiny's cousin, all of the witnesses referred to her as Destiny's aunt.

¶ 8 Mr. Flora remembered April 28, 2014, as "the worst day of [his] life" because "[a] young lady got shot and killed" that day. Destiny called him crying at 8 a.m. and told him that a "girl was threatening her, talking about she was going to kill her, put her where her daddy was at." According to Mr. Flora, Destiny "was scared and she wanted a gun." He told her, "I am not giving you no gun. I want you to go to school and call me when you get out."

¶ 9 Destiny called again at 3 p.m., still crying, still scared. She told Mr. Flora that she had gone to school but left early because, in Mr. Flora's words, "these girls [were] still threatening her, talking about they gone kill her when they catch her." Mr. Flora stated: "She asked me again did I have a gun. I told her naw, I don't have a gun for you. I am not giving you no gun." Ten or fifteen minutes later, Destiny showed up at Vandetta's house with some girls Mr. Flora did not know. The girls stayed outside but Destiny came in. She was "crying and seemed very upset." According to Mr. Flora, the two had the following exchange:

3

"A. She said she needed a gun. This girl kept threatening her. She still threatening her, telling her she gone kill her. Still sending text messages on her Facebook page. She said she wanted to go confront the girl, but she wanted a gun. I said, Destiny, I am not giving you no gun.

* * *

Q. And when you say she stated that she was going to confront the girls, what did that mean?

A. She wanted to go talk to the girl and see why she keep threatening her.

Q. Was she—When you say talk—These are 14-year-old girls, right?

A. Yes.

Q. So when she told you she wanted to go to where these girls were, how did she describe what she was going to do?

A. She said she was going over to this girl house to talk to her. She said she wasn't going over there to fight, but if she want to fight, that's what it's going to have to be, she was going to do it, but she wanted to get this stuff over with because she [was] tired of this girl threatening, keep coming at her and talking and she don't know what for.

Q. And when she told you that, what, if anything, did you tell Destiny?

A. I told her I would go with her.

Q. Did she ask for your advice regarding these girls, what these girls were doing?

A. Naw, not really.

Q. Now, did she ask you to give her anything in this—when she was there?

A. Yes. She asked me for a gun again. I told her no, but I will go with you and make sure nothing happen to you.

4

Q. And what was your purpose in going with her?

A. To protect her.

Q. Now, you had a gun with—You had a gun at Vandetta and Alphonso's house, right?

A. Yes.

Q. When you went to leave to go with—When you told Destiny that you would go with her, what did she say, if anything?

A. She said, okay, come on.

Q. And before you left, did you take anything with you?

A. Yes, I took my gun with me.

Q. And why did you take your gun with you?

A. To protect my niece."

¶ 10   Mr. Flora testified that Vandetta's husband, Alphonso Goodman, helped him down the stairs and Mr. Flora left with Destiny and her friends. They took the bus to 56th and Halsted Streets and headed west, where Mr. Flora saw a crowd of high-school kids convening from different directions. Destiny's friends began calling to her and she said, according to him, "give it here, uncle, I am finna go down there," but he again told her "no, I am not giving you no gun." Mr. Flora insisted that he had no intention of relinquishing possession of the gun to anyone at that point. But, as Mr. Flora explained, when they came to Garfield Boulevard, which "has a big park in the middle of the street," he found himself unable to cross in his wheelchair. For the first time he saw Vandetta walking toward them.

"Q. *** So what did you decide to do at that point?

A. I told Destiny to come here. I told her there go your aunt. Take this and give it

to your aunt and she would go across the street with you to protect you from anything.

Q. By 'this' what are you referring to?

A. The gun.

Q. So at this point you told Destiny to take the gun and give it to her aunt Vandetta?

A. Yes.

¶ 11    According to Mr. Flora, he had rolled himself north to Sangamon Street and Garfield Boulevard (also known as 55th Street) when Destiny ran back to him.

"A. When we stopped at 55th and Sangamon, I told Destiny to gone head and confront the girl. Let the girl know you not on what she's on, stop—leave you alone, stop picking on you, and I will be sitting here waiting on you.

Q. Well, did you say anything to her about Vandetta?

A. Yes. I told her Vandetta would be right behind you. She was going to be there to protect you."

¶ 12    Mr. Flora waited on the corner but could not really see what was going on. About five or ten minutes later, he saw people start running back across the parkway. Two minutes after that the police began to arrive. He waited to see if Destiny was coming and, when he did not see her, he headed in the direction of her mother's house, where he thought she was most likely to go. Mr. Flora testified that he never heard any gunshots. He felt someone pushing him and turned around to see Destiny, who threw her hoodie jacket in his lap. Destiny only pushed him "like 10 feet" before the police "rolled up and grabbed her." Mr. Flora said he "didn't think nothing of it" and believed the police were "grabbing her for the fight" because, as he explained, "[t]hey was grabbing a lot of kids for the fight. She wasn't the only one that got grabbed." When Destiny asked what she had done, Mr. Flora said the officers told her "nothing," they were just questioning her

6

about a fight.

¶ 13    Mr. Flora continued on to Destiny's mother's house but said that before he got there "a guy ran up and tried to snatch Destiny's coat off [his] lap." He did not know the man but had seen him around the neighborhood. Mr. Flora grabbed the jacket back and the two struggled briefly before Mr. Flora was knocked from his wheelchair, at which point the man took off running with the jacket and the police pulled up and chased him. Mr. Flora explained to them what happened and agreed to go to the police station to file charges.

¶ 1     Mr. Flora's account of what happened to the gun was corroborated by Officer Michael Smolek, who testified that he and his partner observed an individual later identified as John B. struggle with Mr. Flora over the jacket, to the point that Mr. Flora fell from his wheelchair to the sidewalk. John B. then took a gun from the jacket, threw the gun to the ground, and ran down an alley, where he was apprehended.

¶ 14    While Mr. Flora was waiting at the police station to press charges against the man who had taken the jacket and the gun off his lap, two officers came in and asked if he knew Destiny. He said he did, and they said she had been involved in a homicide. Mr. Flora said that was the first time he learned about the death of Endia M. and he was "[t]errified." When the officers asked if he had been with Destiny, he told them no. Mr. Flora did not tell the officers about giving the gun to Vandetta, explaining that she was his cousin and had done so much for him, letting him stay with her when he was homeless. She also had children and a husband, and he did not want her to get into trouble. Mr. Flora explained at trial that at the time he was questioned by the police he had no idea that, as numerous witnesses testified at trial, Vandetta gave the gun back to Destiny during the confrontation, or that, as witnesses also testified, she told Destiny to "shoot that bitch." Mr. Flora reiterated that he never intended for Destiny to use the gun to shoot someone or commit any

7

other crime.

¶ 15    On cross-examination, Mr. Flora agreed that handguns are dangerous; he knows this from his own experience. He also admitted that his handgun was stolen. Mr. Flora's trial testimony was undermined by differences between what he testified to and what he had said in his initial statements to the police. When the police began questioning him, his narrative kept changing, beginning with his initial statement that he did not know anything about the situation. However, by the time the police were done questioning him, he had told them most of what he said during his trial testimony, except for the part about him instructing Destiny to give the gun to Vandetta, whom he was still trying to protect.

¶ 16                                    B. The State's Case

¶ 17    Mr. Flora did not see the shooting itself. Much of the evidence regarding what happened once Destiny left Mr. Flora on the curb came from the State's witnesses. Although these witnesses all saw the confrontation between Destiny and the surviving victim, Lanekia "Nikki" R., from slightly different angles, their accounts of what led up to the shooting and the shooting itself were quite similar.

¶ 18                            1. The Events Leading Up to the Shooting

¶ 19    Eighteen-year-old Lanekia testified that she and Endia had been best friends. Lanekia and Destiny had also been friends in grammar school, but by high school, Lanekia said, "I didn't like her, she didn't like me." Destiny had had a fistfight with Endia in the eighth grade and used to date a boy who Lanekia was interested in. Several months prior to the shooting, when Lanekia was a high-school sophomore and Destiny was a freshman, the two began to exchange threatening social media posts. In what appear to have been publicly available comments on her own Facebook page, Lanekia had posted to Destiny, "you going to be put six foot under like your daddy." Lanekia

acknowledged posting this threat—along with others like "bitch, you kill me, I'm killing your daddy, but he gone, so you next," and "I'm telling you I'm going to f*** it up broke girl"—and telling Destiny she was going to "beat her like her daddy." On the day before the shooting, Lanekia posted no fewer than eight threatening messages directed at Destiny. According to Lanekia, Destiny posted threats of her own, saying things like "I'm going to kill both of you B's." On April 28, 2014, Destiny and Lanekia publicly agreed to meet at Lanesha J.'s house, located at 942 West Garfield Boulevard, to settle their dispute.

¶ 20    When school let out that day, Lanekia and Endia took the bus to Lanesha's house, where several of their friends were already waiting for them. There were three adults at the house, including Lanesha's mother Lauren and her friend, Deonna Wright. Lanekia knew that Destiny and her friends were on their way to "face off" with her and Endia and had taken a padlock from school and tied it to a string, wanting to have it "just in case."

¶ 21    Sixteen-year-old Tela T. was part of a group of individuals who rode the bus with Destiny that day to Lanesha's house. Tela testified that Mr. Flora was sitting in his wheelchair at the front of the bus and Destiny's aunt (Vandetta) was in the middle. Tela heard the aunt say to Destiny and a friend of hers, "Y'all better whip their asses." The group got off of the bus together, walked toward Sangamon Street, and ran towards "the field" on Garfield Boulevard, in the direction of the house where the confrontation was to take place. Tela explained that, although she did not need end up needing it, she brought a knife with her "[t]o protect [herself]."

¶ 22                    2. The Confrontation and Shooting

¶ 23    From the front porch, Lanekia and Endia saw Destiny and a crowd of "25 or more" people coming toward the house. Lanekia had only expected Destiny and her close friends. Seeing they were outnumbered, she and Endia ran into the house while Ms. Wright went outside to address the

crowd. Lanekia stood by the door and heard Destiny calling her to come outside, yelling "you said you wanted to fight." Lanekia went outside. She had no weapon. Destiny then reached out and tried to hit Lanekia with a gun that was in her right hand. Lanekia did not see where Destiny got this gun. According to Lanekia, Destiny then pointed the gun at her and said, "I'm going to kill you." Lanekia believed Destiny tried to shoot the gun but it jammed. She ran inside to get the combination lock she had tied to a string but, when she returned, was unable to hit Destiny with it because Ms. Wright was blocking her, trying to separate the two of them. At this point, Lanekia no longer saw a gun in Destiny's hand. But at some point later, without seeing how Destiny came to be holding the gun again, Lanekia saw Destiny raise the gun up and point it at her. Destiny shot three times, grazing Lanekia's upper left arm. Lanekia ran inside, where she saw Endia bleeding on the kitchen floor.

¶ 24     The prosecutor played a cell phone video of the events, in which Lanekia identified herself and others, including Endia and Destiny, narrating the events she had just described. Lanekia also identified a woman in the video wearing a black jacket, black pants, and a bonnet as "Destiny's auntie," a woman Lanekia knew by sight but not by name, and who Lanekia said had arrived with Destiny that day.

¶ 25     Deonna Wright testified that she was a friend of Lanesha's mother, Lauren, and was at their house with them and another adult, Orlandra Lane, to celebrate Lauren's birthday when Endia and Lanekia arrived at around 3:45 p.m. The girls were "saying they had got into it on Facebook," and it soon became clear to the adults that there was going to be a confrontation at the house. At approximately 4:30 p.m., Ms. Wright saw from the front window of the house 30 to 40 people crossing Garfield Boulevard, among them Destiny, whom Ms. Wright had seen at the house before.

¶ 26     Ms. Wright testified that she had gone outside "[t]o prevent them from fighting" and "to

ask what was the problem," when Lanekia came out of the house and began to argue with Destiny. Ms. Wright believed it was Lanekia who took the first swing. Destiny then swung a gun at Lanekia's head and pointed the gun at Lanekia, with her hand on the trigger, before passing the gun to a woman Ms. Wright later learned was Destiny's aunt. Ms. Wright believed that Destiny had tried to fire at Lanekia but the gun jammed. She explained that at that point "there was a lot of commotion going on." Destiny's aunt passed the gun back to Destiny and then Lanekia ran past Ms. Wright with the padlock on a string slung over her shoulder, ready to swing it at Destiny. According to Ms. Wright, Destiny fired five shots as Lanekia ran up the stairs of the house.

¶ 27    Ms. Wright did not know who Mr. Flora was but did recall seeing someone sitting in a wheelchair across the street, separated from the confrontation by the grassy park that ran down the middle of Garfield Boulevard. She identified Mr. Flora as that person in still-frame photographs taken from the cell phone video shown to the jury.

¶ 28    Seventeen-year-old Miteka "Tiny" O. testified that she was friends with Destiny and witnessed the shooting. Destiny informed Miteka by text message that there would be a fight at Lanesha's house that day and Miteka agreed to meet her there. At approximately 4 p.m., Miteka saw Destiny exit a bus with "[h]er auntie, her cousin, Tela, [and] Dominique." Miteka also saw Mr. Flora, whom she did not know at the time, rolling behind them in his wheelchair.

¶ 29    As the group approached Garfield Boulevard, Miteka turned around and saw Mr. Flora and Destiny with the gun. Mr. Flora had the cylinder open, spun it, closed it, and handed the gun to Destiny, who put it in the waistband of her pants. Miteka did not see Mr. Flora load the gun. According to Miteka, Destiny was not trying to hide the gun but in fact lifted her outer shirt as she crossed the street so that the gun was visible, like she was "trying to flash it to everyone." According to Miteka, Mr. Flora didn't cross the street with the others but stayed behind on the

11

curb because Garfield Boulevard was like "two streets and then a big field of grass and trees."

¶ 30    Miteka said that when they arrived at the house, she ran up and tried to diffuse the situation by hugging Lanekia but Destiny rushed forward to hit Lanekia with the gun, missing her and hitting Miteka in the hand instead. When asked what happened next, Miteka said:

>  "She tucked [the gun] back under her shirt and then she passed it to her auntie.
>
>  Because we—it really wasn't no—it was quick, but everybody got to push everybody back.
>
>  And Destiny went back, she walked backward, and then her and her auntie connect."

Miteka did not know Destiny's aunt's name, did not know why Destiny passed the gun to her, and did not see the aunt pass the gun back to Destiny because she had her back turned to them. But when the two were a few feet behind her, and just before Destiny raised the gun, Miteka heard the aunt say "shoot that bitch" or "blow that bitch." Miteka said she "never trust[ed] [Destiny's] auntie." Several other witnesses testified to an exchange between Destiny and Vandetta just before the shooting, in which Vandetta passed the gun back to Destiny, and several witnesses also heard Vandetta encourage Destiny to shoot.

¶ 31    Miteka testified that at first she did not realize Destiny had fired the gun because of "all the horns, the cars and bus got to beeping their horns." She ran back across Garfield Boulevard with Destiny and the others to 57th and Halsted Streets, where they saw Mr. Flora. They tried to get Destiny to get in someone's car but Destiny said, according to Miteka, "no, I have to give my uncle back his stuff." Destiny then crossed the street and gave Mr. Flora back the gun.

¶ 32    John B., the individual Officer Smolek saw take Destiny's jacket and the gun from Mr. Flora, denied struggling with Mr. Flora. He testified instead that Mr. Flora—whose name he did not know but whom he recognized as Destiny's uncle—turned the corner too quickly and fell out of his wheelchair. Then, when John B. tried to help him back up, Mr. Flora tried to give him the

12

gun and jacket.

¶ 33                                    3. Tony Polk

¶ 34    Tony Polk testified that at the time of trial he was serving a sentence for aggravated robbery but had not been promised anything in exchange for his testimony. Mr. Polk stated that while awaiting trial in May 2014, he underwent hernia surgery and was housed, for approximately one week, in the medical wing of the Cook County Jail. On May 8, 2014, he was in the dayroom playing cards with two other men—Michael Poe and Mr. Flora—when Mr. Poe told him that Mr. Flora was the person identified on the news as having given a gun to a 14-year-old girl. Mr. Polk questioned Mr. Flora about the story and, according to Mr. Polk, Mr. Flora told him "don't believe everything that you see on TV."

¶ 35    Mr. Polk said that later, when the two were alone, Mr. Flora "enlightened [him] about the situation *** how it happened, why it happened." Mr. Polk claimed Mr. Flora told him that he gave Destiny the gun because of an "ongoing beef with her, the family, and some other members," pursuant to which Endia's family was trying to "flip" Destiny to a rival gang. When asked if anyone went with Mr. Flora and Destiny to the scene of the shooting, Mr. Polk said "I believe there was a female. I can't remember her name." Mr. Polk said Mr. Flora told him how he and the unidentified female "pretty much coached the 14 year old, his niece, on what to do *** gave her the gun and *** basically, telling her to shoot." On cross-examination, Mr. Polk insisted—contrary to the testimony of every other witness in the case—that Endia had in fact been the intended target and that the shooting had nothing to do with a dispute between Destiny and Lanekia.

¶ 36    At the time of trial, Mr. Polk had been imprisoned since 2013 or 2014 for aggravated robbery. When he spoke with Mr. Flora, Mr. Polk had been in jail awaiting trial for six months. Mr. Polk knew, from discussions with his lawyer, that he faced a prison sentence of 4 to 15 years.

He ultimately pleaded guilty to aggravated robbery, the most serious offense he was charged with, in exchange for a sentence of 6 years in prison, served at 50%. When asked if he ever tried to "ask for credit" for offering testimony in Mr. Flora's case, Mr. Polk said "nah, I didn't think much about it." When pressed, however, he acknowledged the following:

> "Q. The reason you told your lawyer, before she told you you should have gone to her first, is you told her, hey, I went to the Grand Jury on Flora, because I want to get— use that, get me some time with it. And she said I can't you should have told me first; right?
>
> A. It was something like that."

Mr. Polk insisted, however, that he had not expected the State to offer him a deal for his testimony and was in fact testifying, in defense counsel's words, "out of the goodness of [his] own heart."

¶ 37    A hearing, pursuant to *People v. Montgomery*, 47 Ill. 2d 510 (1971), was then held outside of the jury's presence to determine the admissibility of Mr. Polk's prior convictions. The trial court agreed with the State that the only admissible offense, for impeachment purposes, was the aggravated robbery that Mr. Polk was then serving time for.

¶ 38                             C. Other Defense Witnesses

¶ 39    Vandetta's husband, Alphonso Goodman, testified that he and Mr. Flora were at the house that he shared with Vandetta on the afternoon of the shooting. Mr. Flora received a telephone call from Destiny, who later came to the house. Mr. Goodman saw Mr. Flora show Destiny a gun in his waistband. Then, according to Mr. Goodman, Destiny and some of her friends—four other girls—rolled Mr. Flora in his wheelchair out of the house. When Vandetta arrived home from work at 3 p.m., Mr. Goodman told her "Destiny went to go fight," and Vandetta also left the house.

¶ 40    Vandetta also testified, confirming that she returned home from work on the afternoon of April 28, 2014, had a conversation with Mr. Goodman, and then left. When asked where she went,

and in response to all other questions put to her, Vandetta invoked her fifth amendment right against self-incrimination.

¶ 41    Several of Destiny's friends also testified about what they observed during the fight. Three individuals confirmed, as Ms. Wright had testified, that they saw Vandetta give Destiny the gun. And two individuals, like Miteka, heard Vandetta say to Destiny, "shoot the bitch" or something similar.

¶ 42    The parties stipulated that, according to Mr. Flora's telephone records, he and Destiny exchanged several telephone calls between 3:24 p.m. and 4:12 p.m. on April 28, 2014.

¶ 43    Closing arguments, which form the basis on which we reverse, are discussed below in our analysis.

¶ 44                        D. Verdict and Sentencing

¶ 45    The jury deliberated for approximately two hours and, on January 30, 2016, found Mr. Flora guilty as charged. The court sentenced him to 65 years for the first degree murder of Endia and 35 years for the attempted first degree murder of Lanekia, to be served consecutively.

¶ 46    Among the purported errors asserted by Mr. Flora in his posttrial motion were (1) that the State failed to prove him guilty beyond a reasonable doubt; (2) that the trial court erroneously denied defense counsel's objections to the State's closing argument and sustained the State's objections to defense counsel's closing argument regarding what the State had to prove to establish accountability; and (3) generally, that the trial court erred by denying Mr. Flora's trial objections. Following a hearing, the court denied the motion in its entirety.

¶ 47                            II. JURISDICTION

¶ 48    The trial court denied Mr. Flora's motion to reconsider his sentences on April 1, 2016, and he timely filed his notice of appeal the same day. We have jurisdiction pursuant to article VI,

15

section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court

Rules 603 (eff. Feb. 6, 2013) and 606 (eff. Dec. 11, 2014), governing appeals from final judgments

of conviction in criminal cases.

¶ 49                                III. ANALYSIS

¶ 50    On appeal, Mr. Flora urges us to reverse his convictions on the grounds that (1) the

prosecutor's closing argument, the court's rulings, and the sustained objections to his own closing

led the jury to misunderstand what the State had to prove to show Mr. Flora was legally responsible

for Destiny's conduct; (2) the State failed to prove beyond a reasonable doubt that he and Destiny

shared a common criminal design; and (3) the trial court erred by preventing defense counsel from

cross-examining jailhouse witness Tony Polk regarding his extensive criminal history. In the

alternative, Mr. Flora argues the aggregate 100-year sentence he received is excessive. We address

each issue in turn.

¶ 51             A. The Law of Accountability and the State's Closing Argument

¶ 52    Mr. Flora argues that he did not receive a fair trial because the prosecutor misstated the law

of accountability in her closing argument and misrepresented to the jury that it was "undisputed"

that Mr. Flora was responsible for Destiny's criminal acts. The State suggests that this issue is

forfeited, arguing in a footnote that although defense counsel made contemporaneous objections

to the prosecutor's statements at trial, he failed to preserve those objections by specifically

including them in Mr. Flora's posttrial motion. We reject this argument.

¶ 53    As we have made clear on numerous occasions, "[s]ubstantive arguments may not be made

in footnotes." See, *e.g.*, *Technology Solutions Co. v. Northrop Grumman Corp.*, 356 Ill. App. 3d

380, 382 (2005). Even if properly raised, we would be disinclined to find forfeiture here. "We

require parties to preserve issues or claims for appeal; we do not require them to limit their

arguments [on appeal] to the same arguments that were made below." *Brunton v. Kruger*, 2015 IL 117663, ¶ 76. Mr. Flora preserved his claim that the State misrepresented in its closing what it needed to prove for the jury to find him accountable for Destiny's criminal conduct. He has not forfeited that claim by supporting it differently on appeal than he did in his posttrial motion. See *id.* (finding no forfeiture where "[e]ven if [the appellant] did not make a common interest argument in the circuit court, he disputed the issue of waiver").

¶ 54    The parties next disagree on the proper standard of review where a defendant challenges comments made by the State in closing argument. Mr. Flora urges us to review the prosecutor's comments *de novo*; the State says we must consider only whether the trial court abused its discretion. We have previously noted the apparent conflict on this issue created by our supreme court's decisions in *People v. Blue*, 189 Ill. 2d 99 (2000), and *People v. Wheeler*, 226 Ill. 2d 92 (2007), most often concluding that the conflict need not be resolved because the outcome would be the same under either standard. See, *e.g.*, *People v. James*, 2017 IL App (1st) 143036, ¶ 45.

¶ 55    In *Blue*, the court applied without comment the standard established in earlier cases that "[t]he regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion." *Blue*, 189 Ill. 2d at 128. But in *Wheeler* the court noted—with no indication that it was establishing a new standard of review—that "[w]hether statements made by a prosecutor at closing argument were so egregious that they warrant a new trial is a legal issue [the] court reviews *de novo*." *Wheeler*, 226 Ill. 2d at 121. The cases involved prosecutorial misconduct in the form of inflammatory statements that were meant to appeal to the jurors' passions and prejudices." *Wheeler*, 226 Ill. 2d at 129-34; *Blue*, 189 Ill. 2d at 130-31.

¶ 56    More recent decisions have thought to reconcile the two authorities, recognizing that the

appropriate standard should be dictated by the nature of the decision we are called on to review. See, *e.g.*, *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 63-64. Where the disputed issue is, as here, whether the law was accurately conveyed to the jury, we believe our review must be *de novo*. *Cf. Barth v. State Farm Fire & Casualty Co.*, 228 Ill. 2d 163, 170 (2008) (noting that "[a]lthough jury instructions are generally reviewed for an abuse of discretion, our standard of review is *de novo* when the question is whether the applicable law was accurately conveyed").

¶ 57    In considering whether purported misstatements of the law require reversal or were harmless, several well-recognized principles guide our analysis. We bear in mind that the prosecution "is given wide latitude in closing argument" to "comment on the evidence and the strength of its case." *People v. Cloutier*, 156 Ill. 2d 483, 507 (1993). Statements challenged as improper "must be considered in [the] context of the entire closing argument of both the State and the defendant." *Id.* And to warrant reversal, an improper comment must have "caused substantial prejudice to the defendant, taking into account the content and context of the comment, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." *People v. Johnson*, 208 Ill. 2d 53, 115 (2003).

¶ 58    Here, both the prosecution and the defense focused on the law of accountability in their closing arguments. Section 5-2(c) of the Criminal Code of 2012 (Code) provides that "[a] person is legally accountable for the conduct of another when: *** either before or during the commission of an offense, and with the intent to promote or facilitate that commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2012). It further provides that "[w]hen 2 or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the common design or

18

agreement and all are equally responsible for the consequences of those further acts." *Id.* Our supreme court has recognized that this section establishes "two distinct accountability schemes." *People v. Fernandez*, 2014 IL 115527, ¶ 21. The State may present evidence "that either (1) the defendant shared the criminal intent of the principal, or (2) there was a common criminal design." *Id.* ¶ 13.

¶ 59    The accountability instruction the trial court read to the jury in this case was a variation of Illinois Pattern Jury Instruction, Criminal, No. 5.03 (I.P.I. 5.03). Although that instruction generally tracks the statutory language, it makes no specific mention of a "common criminal design":

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.

> The word 'conduct' includes any criminal act done in furtherance of the planned and intended act."

¶ 60    During closing argument, the prosecutor in this case first recited the pattern instruction for the jury. She then proceeded to explain to the jurors what the instruction meant, assuring them that the law of accountability was "a very common concept" that they should already be quite familiar with from watching sports teams:

> "You see it a lot in teams. When a team plays, when the Blackhawks are playing, Corey Crawford blocks a lot of goals, at the end of the night it's not Corey Crawford [who] won, it's the Blackhawks, the team that takes the win together. And if he's having an off night, a lot of goals are scored, the Blackhawks lose. The title doesn't say Corey Crawford. It's

teamwork. It's the whole idea of teamwork; people working together, they share equal—"

¶ 61    Defense counsel's objection that this analogy misstated the law was immediately overruled by the trial court, and the prosecutor continued throughout her closing argument to state that Mr. Flora was a member of "Team Destiny":

> MS. BAILEY [PROSECUTOR]: It's the notion in for a penny in for a pound. And what the law tells you is that this defendant is equally responsible for the actions of Destiny [P.] And when that gun is in Destiny [P.'s] hands, it's as if it were still in his hands. That's what that law tells you. It tells you everybody, no matter what part they play, are equally responsible. So he is equally responsible for her. They were a team back on April 28th of 2014. She was under his tutelage.

> * * *

> [H]e's still part of that team. They're all one. They're that matched together, the unit.

> MR. BRODSKY: Objection, mistakes the law.

> THE COURT: Overruled.

> MS. BAILEY: They were a team that day from beginning to the end."

¶ 62    When the prosecutor then took the jurors through the elements the State needed to prove for them to find Mr. Flora guilty of first degree murder, she told them that the first element of the offense—which as stated encompassed Mr. Flora's guilt by accountability—was "undisputed":

> "Let's go back to those three propositions that the State must prove. First, that the defendant, or one for whose conduct he is legally responsible, while armed with a firearm, performed the acts which caused the death of Endia [M.] Well, that's undisputed in this case. It's undisputed that the defendant, or one for whose conduct he is legally responsible—"

¶ 63    Defense counsel immediately objected but—before he could even articulate a basis—the trial court overruled his objection. When counsel was finally able to speak and to say that his objection was to the prosecutor's use of the word "undisputed," the court again overruled the objection, saying "I understand the argument" and "[t]he argument should conform to the evidence and the arguments in the case."

¶ 64    We agree with Mr. Flora that the prosecutor's comments during closing argument, combined with the trial court's immediate overruling of defense counsel's objections, may well have led the jury to conclude that Mr. Flora's accountability for Destiny's criminal acts was "undisputed." Jurors presumably unfamiliar with the law of accountability were told that it was very simple; that they should think of it just as they would a hockey team, where all of the players work together toward a common goal. This was a serious mischaracterization of the law. There is nothing illegal about playing and winning a hockey game. The jurors were then told that Mr. Flora's accountability was "undisputed." For a defendant to be found guilty by accountability for another's criminal conduct, however, the two must share, not just any common goal, but a common *criminal* design. They must intend to commit a crime together and the conduct the defendant is charged with being accountable for must have been in furtherance of that agreed crime. The effect of the State's improper analogy was compounded and reinforced by what might otherwise have been innocuous remarks about Mr. Flora being on "Team Destiny," and the two being "matched together" and functioning as "a unit."

¶ 65    We believe the combined effect of these statements gave the jury the impression that the State did not need to prove that the murder and attempted murder were in furtherance of some other crime that Mr. Flora and Destiny intended to commit. But the State *did* need to prove this. It improperly led the jury to believe otherwise.

21

¶ 66    We are not persuaded, as the State argues on appeal, that the prosecutor's misstatements were cured by the trial court reading the two sentences that make up the pattern jury instruction on accountability. Although it is true as a general matter that a "court's instructions carry great weight with a jury and may cure a prosecutor's misstatements of law," this is typically so where "the alleged misstatements are not emphasized or repeated." *People v. Purdle*, 212 Ill. App. 3d 594, 598 (1991). In *People v. Lawler*, 142 Ill. 2d 548, 563-65 (1991), for example, although the prosecutor "clearly misstated the law" when he told the jury that the law "presumes" that a defendant with a prior felony conviction is not telling the truth, our supreme court found the isolated statement to be "of little consequence" because the trial court gave "very specific instructions" regarding how the jury should consider the evidence of the defendant's prior convictions and admonished them that any statements to the contrary made by the lawyers should be disregarded.

¶ 67    However, even an accurate jury instruction will not always cure misstatements of the law during closing. This is especially so when a complex legal concept like accountability is at issue. *People v. Ong*, 94 Ill. App. 3d 780 (1981), is instructive. The defendant in that case was convicted of arson based on the testimony of two brothers, whom the State argued were her accomplices. *Id.* at 781-83. The prosecutor argued that the defendant was herself an accomplice because "[t]hey were all there." *Id.* at 788. Defense counsel's objection to this label was overruled. *Id.* Throughout the rest of his argument the prosecutor then repeatedly argued that the defendant was accountable for the brothers' crime because she was an "accomplice." *Id.* at 789-90. The trial court in *Ong*, like the court in this case, correctly instructed the jury on the law of accountability. *Id.* at 789. In fact, it went one step further, telling the jury in that case that a person's "[m]ere presence at the scene of the crime or negative acquiescence in another's actions is insufficient to make a defendant

accountable." *Id.*

¶ 68    The appellate court nevertheless found reversable error, explaining why the prosecutor's misstatements regarding the applicable law were not cured by the court's proper instruction:

> "Once the jury had been repeatedly informed, by the prosecutor and the court, that one is 'accountable' for a crime if one is an 'accomplice,' the rule of law, that 'mere presence at the scene of the crime or negative acquiescence in another's action is insufficient to make a defendant accountable,' was negated in the minds of the jury. *** [T]he prosecutor argued to the jury that [the defendant] was an accomplice because '(t)hey were all three there' and '(t)hey all three testified in this court.' Thus, the jury was informed that [the defendant]'s presence at the scene of a crime (to which [one of the brothers] had already pleaded guilty) plus her testimony in her own defense, made her an accomplice, and, as an accomplice, she was accountable for the criminal act of [the brother]. Such an argument not only misstates the law of accountability, it plays havoc with the presumption of innocence and the right to testify in one's own defense.
>
> The prosecution further compounded the confusion by characterizing [the defendant] and [the brothers] as 'common drinking buddies,' who were like 'peas in a pod,' and noting that 'birds of a feather flock together.' *** While these latter remarks about the relationship [between the three] do not, in themselves, rise to the level of reversible error, they, combined with the prosecutor's attempt to define accountability as presence at the scene of a criminal act, worked to further confuse the jury to the prejudice of the defendant." *Id.* at 789-90.

The court held that the combined effect of the prosecutor's statements denied the defendant in *Ong* a fair trial. *Id.* at 790.

¶ 69     We view the prosecutor's statements in this case in a similar light. The potentially curative effect of proper jury instructions must be considered in the context of the trial court's handling of contemporaneous objections to the improper statements that the instructions are designed to cure. Here, as in *Ong*, the trial court did not promptly sustain defense counsel's objections but instead promptly *overruled* them (*id.* at 788-89), effectively putting the imprimatur of the court on the State's misstatements of law. This is why the appellate court in *Ong* concluded—proper instructions notwithstanding—that once the jurors had been repeatedly misinformed regarding the law of accountability "by the prosecutor *and the court*" (emphasis added), "the [correct] rule of law *** was negated in [their] minds." *Id.* at 789.

¶ 70     The law of accountability—pursuant to which the State may hold one individual legally accountable for the criminal conduct of another based on their shared common plan to commit some *other* crime—is nuanced, to say the least. See *People v. Wilson*, 37 Ill. App. 3d 560, 563 (1976) (noting that "the jury had to wrestle with the complex issue of accountability"). It is not, as the State urged the jury to believe in this case, a simple matter of deciding whose "team" someone is on. The jurors in this case were asked to apply the common criminal design theory of accountability. But because the words "common criminal design" do not appear anywhere in I.P.I. 5.03, they were essentially asked to extrapolate that complex rule from the portion of the statutory text contained in the instruction. As we recognized in *Ong*, under these circumstances, the general presumption that a technically accurate instruction will cure any misstatement of the law simply does not hold up.

¶ 71     The trial court's admonition—after twice overruling defense counsel's objections to the State's argument that accountability was "undisputed"—that "[t]he argument should conform to the evidence and the arguments in the case," did nothing to clarify that the issue of accountability

24

was, in fact, disputed.

¶ 72     Mr. Flora also contends that the trial court erred in sustaining the State's objections to his own closing argument, in which he insisted that a voluntary fight is not a crime. The State continues to argue that this was not an accurate statement of the law. We need not resolve this issue, however, since our holding rests on the State's closing argument and the court's rulings in response to that argument.

¶ 73     We conclude that the prosecutor's statements in closing argument, taken as a whole and considered with the trial court's immediate overruling of defense counsel's objections to those statements, gave an improper impression of what the State had to prove to establish Mr. Flora's guilt by accountability that was not cured by the court's reading of the accountability instruction to the jury. This was error of sufficient magnitude to cause Mr. Flora substantial prejudice and constitute a material factor in his conviction. *People v. Gonzalez*, 388 Ill. App. 3d 566, 587 (2008). To apply the law in the manner prescribed by the State, the jury would have to have rejected out of hand Mr. Flora's primary defense in this case: that he never intended for Destiny to commit any crime. This was a viable defense not directly contradicted by any other evidence. Although the jurors were free to reject it, we cannot say that Mr. Flora received a fair trial where the jurors may well have believed that they were not free even to consider it. We reverse Mr. Flora's convictions.

¶ 74                                B. Sufficiency of the Evidence

¶ 75     Mr. Flora would have us reverse outright, rather than remand for a retrial, on the basis that the State failed to prove his guilt by accountability beyond a reasonable doubt. When the sufficiency of the evidence supporting a criminal conviction is challenged, "[t]he relevant inquiry is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People*

*v. Ward*, 215 Ill. 2d 317, 322 (2005). We will only reverse a conviction on this basis if "the evidence is so unreasonable, improbable or unsatisfactory that it raises a reasonable doubt of [the] defendant's guilt." *People v. Evans*, 209 Ill. 2d 194, 209 (2004). We find that Mr. Flora's convictions were sufficiently supported by the evidence at trial.

¶ 76 Although it is true that a defendant's mere "presence at the commission of [a] crime, even when joined with flight from the crime or knowledge of its commission, is not sufficient to establish accountability," these are still factors the court may consider. *People v. Perez*, 189 Ill. 2d 254, 268 (2000). "Proof of [a] common purpose or design," moreover, "need not be supported by words of agreement," just as acts in furtherance of that design need not be "committed pursuant to a preconceived plan." *In re W.C.*, 167 Ill. 2d 307, 338 (1995). It is enough that "a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design." *Id.*

¶ 77 Here, Mr. Flora was not "merely present" at the scene of the crime. The jury was entitled to conclude that he knew Destiny was about to engage in a violent fistfight and, having accompanied her to that fight and supplied her with a weapon to take to that fight, was accountable for the shootings that followed. See *People v. Mischke*, 278 Ill. App. 3d 252, 262 (1995) (finding sufficient evidence of a common criminal design where the defendants, "were involved in the common design to go armed to [an] apartment complex to commit aggravated assault or battery," were "present during the shooting" that ensued, "fled the scene, maintained a close affiliation with [the shooter], and failed to report the crime").

¶ 78 Relying on the general proposition that "[t]he consent of the person assaulted to the act complained of is a good defense to a prosecution for assault" (3 Ill. L. and Prac. *Assault, Battery and Bodily Harm* § 39), Mr. Flora maintains that a consensual fistfight is not a crime. In response, the State cites cases standing for the proposition that a criminal offense is "a wrong affecting the

general public" that "cannot be licensed by the individual directly harmed" (*People v. Ford*, 2015 IL App (3d) 130810, ¶ 21). According to those cases, consent may be a defense to "offensive touchings and insignificant bodily injuries," but not to "hard blows and more serious injuries." (Internal quotation marks omitted.) *Id.* We need not decide precisely where this line should be drawn. Here, the jury could reasonably have concluded, as the State argued, that a violent encounter likely to result in physical injuries was contemplated by all involved. Taken in the light most favorable to the State, the evidence presented at trial was sufficient to prove beyond a reasonable doubt that Mr. Flora and Destiny shared a common criminal design.

¶ 79                              C. Barred Evidence of Mr. Polk's Criminal History

¶ 80     Mr. Flora also argues that the trial court erred when it barred evidence—beyond the conviction for aggravated robbery Mr. Polk was then serving time for—of Mr. Polk's prior convictions. Mr. Flora contends that his counsel was thus prevented from effectively cross-examining Mr. Polk to discover if Mr. Polk's extensive criminal history led him to believe he would receive a lengthy sentence in the aggravated robbery case if he did not offer the State false information about Mr. Flora. Mr. Flora forfeited review of this issue by failing to include it in his posttrial motion. Having reversed Mr. Flora's convictions on other grounds, we need not consider his arguments in favor of plain error review. We briefly address the underlying issue only because it seems likely to reoccur on remand. *People v. Hari*, 218 Ill. 2d 275, 299 (2006) ("on review, once it is decided that a new trial is required, additional claims of error may be addressed if they are likely to arise again in the course of retrial").

¶ 81     The State argues that Mr. Polk's prior convictions were properly excluded because they did not meet the threshold requirements for admissibility set out in *People v. Montgomery*, 47 Ill. 2d 510, 519 (1971). Those requirements, now codified in Rule 609 of the Illinois Rules of

Evidence, are that, "[f]or the purpose of attacking the credibility of a witness," evidence of a past conviction is admissible only if (a) the crime was a felony or "involved dishonesty or false statements" *and* (b) more than 10 years have not elapsed since the defendant's conviction or release from confinement, whichever is later. Ill. R. Evid. 609(a)-(b) (eff. Jan. 6, 2015). Under *Montgomery*, convictions failing to meet these requirements are *per se* inadmissible when used to attack witness credibility. And even where the *Montgomery* requirements are met, the trial court may in its discretion bar evidence of a prior conviction if its probative value is "substantially outweighed by the danger of unfair prejudice." Ill. R. Evid. 609(a) (eff. Jan. 6, 2015).

¶ 82    Mr. Flora agrees that all of Mr. Polk's prior convictions—for "a series of bond forfeitures," misdemeanor domestic batteries, and felonies more than 10 years old—failed to meet *Montgomery*'s threshold admissibility requirements. His position is that those requirements do not apply. Mr. Flora relies on *People v. Ramey*, 152 Ill. 2d 41, 67 (1992), for the proposition that a criminal defendant has a constitutional right to cross-examine the State's witnesses regarding their potential "biases, prejudices or ulterior motives."

¶ 83    Mr. Flora is correct. In *People v. Bull*, 185 Ill. 2d 179, 206 (1998), our supreme court explained that, "although evidence of arrests or other charges is not admissible to impeach credibility generally, such evidence is admissible to show that the witness'[s] testimony may be influenced by bias, interest, or motive to testify falsely." See also *People v. Sanders*, 143 Ill. App. 3d 402, 407 (1986) (noting that "[i]mpeachment of a witness'[s] credibility on the basis of bias, interest or motive to testify falsely is distinguishable from impeachment by proof of conviction of a prior crime" and only "[t]he latter is governed by the principles enunciated in [*Montgomery*]") Cross-examination to show bias or motive to testify falsely "is a matter of right, subject only to the trial court's broad discretion to preclude repetitive or unduly harassing interrogation and to

confine the cross-examination to a proper subject matter." *Id.* The evidence used "must not be remote or uncertain" and "must give rise to the inference that the witness has something to gain or lose by his or her testimony." *Bull*, 185 Ill. 2d at 206.

¶ 84    It is clear from the record in this case that the trial court considered the admissibility of Mr. Polk's prior convictions only under *Montgomery*. But in fairness to the court, the record also reflects that defense counsel never made clear, as Mr. Flora now does on appeal, that Mr. Polk's prior convictions were being offered to demonstrate that he had a specific motive to lie, rather than as evidence of Mr. Polk's general trustworthiness. If the issue arises again on retrial, counsel should take care to correctly frame the issue so that it may be properly addressed by the trial court.

¶ 85                                        IV. CONCLUSION

¶ 86    For the reasons discussed, we reverse Mr. Flora's convictions for first degree murder and attempted first degree murder and remand this matter for a new trial. Our determination that the evidence was sufficient to support Mr. Flora's convictions means that double jeopardy is no bar to retrial. *People v. Lovejoy*, 235 Ill. 2d 97, 123 (2009). We need not reach Mr. Flora's arguments regarding his sentence.

¶ 87    Reversed and remanded.